STATE OF CALIFORNIA Acting By and Through Governor Edmund G. BROWN, Jr., The California Coastal Commission, The California Air Resources Board, The California Resources Agency, and The California Department of Conservation, Petitioners,

v.

James G. WATT, Secretary of the Interior and the United States Department of the Interior, Respondents,

American Petroleum Institute, et al., Intervenors.

STATE OF ALASKA, Petitioner,

v.

James G. WATT, Secretary of the U.S. Department of the Interior, United States Department of the Interior, Respondents,

American Petroleum Institute, et al., Intervenors.

NATURAL RESOURCES DEFENSE COUNCIL, INC., Sierra Club, Conservation Law Foundation of New England, Inc., and Friends of the Earth, Petitioners,

v.

James G. WATT, Secretary of the Interior, and the United States Department of the Interior, Respondents,

American Petroleum Institute, et al., Intervenors.

NORTH SLOPE BOROUGH, Jacob Adams, Mayor of the North Slope Borough, and Lloyd Ahvakana, Petitioners,

v.

James G. WATT, Secretary of the Interior and the United States Department of the Interior, Respondents,

American Petroleum Institute, et al., Intervenors.

Nos. 80–1894, 80–1897, 80–1935 and 80–1991.

United States Court of Appeals, District of Columbia Circuit.

Argued March 4, 1981.

Decided Oct. 6, 1981.

Jonathan K. Tillinghast, Sp. Asst. Atty. Gen., Juneau, Alaska, with whom Wilson Condon, Atty. Gen., State of Alaska, Juneau, Alaska, was on the brief, for petitioner in No. 80–1897.

Sarah Chasis, New York City, with whom Jane Bloom, New York City, was on the brief, for petitioners in No. 80–1935.

Theodora Berger, Deputy Atty. Gen., State of Cal., Los Angeles, Cal., with whom John A. Saurenman, Deputy Atty. Gen., State of Cal., Los Angeles, Cal., was on the brief, for petitioners in No. 80–1894.

Bruce J. Terris, Washington, D. C., with whom James M. Hecker and Edward H. Comer, Washington, D. C., were on the brief, for petitioners in No. 80–1991.

Margaret Strand, Atty., Dept. of Justice, Washington, D. C., with whom Anthony C. Liotta, Acting Asst. Atty. Gen., Bruce C. Rashkow and William M. Cohen, Attys., Dept. of Justice, Washington, D. C., were on the brief, for respondents.

E. Edward Bruce, Washington, D. C., with whom Constance J. Chatwood, Stark Ritchie and David T. Deal, Washington, D. C., were on the brief, for intervenors in Nos. 80–1894, 80–1897, 80–1935 and 80–1991.

Stephen M. Leonard,. Asst. Atty. Gen., Com. of Mass., Boston, Mass., was on the brief, for amicus curiae urging remand to the Secretary for reconsideration in Nos. 80–1894, 80–1897, 80–1935 and 80–1991.

Before MacKINNON and ROBB, Circuit Judges, and AUBREY E. ROBINSON, Jr.,[*] District Judge for the District of Columbia.

Opinion PER CURIAM.

PER CURIAM:

Petitioners have filed four consolidated petitions challenging the five year program for oil and gas leasing prepared by Secretary of Interior Andrus pursuant to the Outer Continental Shelf Lands Act, as amended. The leasing program, developed under section 18 of the Act, serves as an outline for the leasing of drilling rights on the outer continental shelf (OCS) for the years 1980–1985 and consists of a schedule of proposed lease sales and related planning steps for those sales. Petitioners[1] claim that the Secretary prepared the leasing program in violation of the Outer Continental Shelf Lands Act, the Administrative Procedure Act,[2] the National Environmental Policy Act,[3] and a special trust responsibility allegedly owed to Alaskan natives. The

---

[*] Sitting by designation pursuant to 28 U.S.C. § 292(a).

1. Petitioners include the State of Alaska and California, the Natural Resources Defense Council, Inc., and the North Slope Borough, a local governmental body in Alaska. The State of Massachusetts participated as amicus curiae, urging that the leasing program be remanded. The American Petroleum Institute intervened on behalf of respondent Andrus, urging that the petitions for review be dismissed.

2. 5 U.S.C. § 553.

3. 42 U.S.C. § 4321 et seq. Our disposition of this case makes it unnecessary to reach the National Environmental Policy Act claims.

new Secretary of the Interior is now revising the leasing program, and petitioners seek a remand of the present program for revision in a manner consistent with statutory requirements. For the reasons stated below, we grant that request and remand the record for consideration of those parts of the leasing program that are not affirmed.

## I. BACKGROUND

Congress enacted the Outer Continental Shelf Lands Act[4] in 1953 to extend "[t]he Constitution and laws and civil and political jurisdiction of the United States . . . to the subsoil and seabed of the Outer Continental Shelf."[5] The 1953 Act authorized the Secretary of Interior to grant leases by competitive bidding in order to explore and develop the oil and gas deposits of the shelf's submerged lands,[6] and empowered him to promulgate regulations to administer the provisions of the Act.[7] Congress has since described this "very general"[8] mandate as "essentially a carte blanche delegation of authority to the Secretary of Interior."[9]

Exploitation of OCS resources under the 1953 Act proceeded at first at a relatively slow pace, with development activity concentrated off the coastal states bordering the Gulf of Mexico and in one small area off southern California in the Santa Barbara Channel.[10] During this period, OCS activities were localized in impact and received little national scrutiny.[11]

Two major events, however, changed all that and moved OCS development into the forefront of the national consciousness. The first was the blowout of an OCS drilling project in the Santa Barbara Channel on January 28, 1969, resulting in the "largest oil spill in U.S. history",[12] and highlighting the environmental dangers associated with OCS exploitation. The second was the Arab oil embargo of 1973, which dramatically underscored the nation's dependence on foreign sources of oil.[13] In response to the latter, President Nixon directed on January 23, 1974, that 10 million acres of the OCS be leased in 1975.[14] This announcement was significant not only because it proposed leasing an amount of territory in one year almost equal to that which had been leased since the OCS program began in the early 1950's,[15] but also because it envisioned moving into previously undeveloped or "frontier" areas off the Atlantic and Pacific coasts and off Alaska.[16]

The announcement crystallized growing concern over the impact of OCS activities and the adequacy of the 1953 Act.[17] Although the need to develop national energy independence was clear, state and local governments feared damaging impacts to their coastlines from oil spills and the on-

---

4. Pub.L.No. 83–212, 67 Stat. 462 (1953) (codified in 43 U.S.C. § 1331 et seq.).

5. 43 U.S.C. § 1333(a)(1).

6. 43 U.S.C. § 1337.

7. 43 U.S.C. § 1334.

8. H.R.Rep.No.590, 95th Cong., 1st Sess. 57 (1977), U.S.Code Cong. & Admin.News 1978, p. 1450.

9. Id. at 54, U.S.Code Cong. & Admin.News 1978, p. 1461; id. at 102–103, U.S.Code Cong. & Admin.News 1978, p. 1509 (describing the 1953 Act as "essentially an open-ended grant of authority" and "a grant of total discretion to the Secretary"); S.Rep.No.284, 95th Cong., 1st Sess. 48 (1977) (describing 1953 Act as grant of " 'bare bones' leasing authority with essentially no statutory standards or guidelines"); accord, 122 Cong.Rec. H16642 (1976) (remarks of Rep.

Murphy); 121 Cong.Rec. S2044 (1975) (remarks of Sen. Jackson); 120 Cong.Rec. S7840 (1974) (remarks of Sen. Jackson).

10. H.R.Rep.No.590, supra n.8, at 74; S.Rep.No. 284, supra n.9, at 49, 50.

11. H.R.Rep.No.590, supra n.8, at 74.

12. Id. at 74, U.S.Code Cong. & Admin.News 1978, p. 1481.

13. Id. at 89.

14. See id. at 76, 89; S.Rep.No.284, supra n.9, at 50.

15. H.R.Rep.No.590, supra n.8, at 100.

16. Id. at 65.

17. Id. at 100.

shore development which accompanies off-shore drilling.[18] Commercial and recreational fishing interests expressed concern over the possible effects on their livelihoods and leisure activities,[19] while environmental and citizens groups raised questions about the effect of OCS activities on the ecology.[20] These interests accordingly sought a role in the offshore leasing policy decisions which had previously been committed to the virtually unlimited discretion of the Secretary.[21]

These pressures led to the introduction of legislation in 1974 to overhaul the 1953 Act, and culminated four years later in the passage of the Outer Continental Shelf Lands Act Amendments of 1978.[22] The 1978 Amendments [23] were intended to provide a comprehensive framework for the

> expeditious and orderly development [of the OCS], subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs.[24]

In greater detail, the purposes of the 1978 Amendments are to: [25]

(1) establish policies and procedures for managing the oil and natural gas resources of the Outer Continental Shelf which are intended to result in expedited exploration and development of the Outer Continental Shelf in order to achieve national economic and energy policy goals, assure national security, reduce dependence on foreign sources, and maintain a favorable balance of payments in world trade;

(2) preserve, protect, and develop oil and natural gas resources in the Outer Continental Shelf in a manner which is consistent with the need (A) to make such resources available to meet the Nation's energy needs as rapidly as possible, (B) to balance orderly energy resource development with protection of the human, marine, and coastal environments, (C) to insure the public a fair and equitable return on the resources of the Outer Continental Shelf, and (D) to preserve and maintain free enterprise competition;

(3) encourage development of new and improved technology for energy resource production which will eliminate or minimize risk of damage to the human, marine, and coastal environments;

(4) provide States, and through States, local governments, which are impacted by Outer Continental Shelf oil and gas exploration, development, and production with comprehensive assistance in order to anticipate and plan for such impact, and thereby to assure adequate protection of the human environment;

(5) assure that States, and through States, local governments, have timely access to information regarding activities on the Outer Continental Shelf, and opportunity to review and comment on deci-

**18.** *Id.* at 89.

**19.** *Id.*

**20.** *Id.*

**21.** *Id.; Energy Action Educational Foundation v. Andrus,* 654 F.2d 735, at 738–740 (D.C.Cir. 1980).

**22.** The first bill on the subject, S.3221, see S.Rep.No.1140, 93rd Cong., 2d Sess. (1974), passed the Senate in September 1974, 120 Cong.Rec. S31654 (1974), but died when the House failed to act thereon that year. In the 94th Congress, legislation passed both the Senate (S.521, 121 Cong.Rec. S26047 (1975)), and the House (H.R.6218, 122 Cong.Rec. H23189–90 (1976)), but the conference bill was killed on the House floor. 122 Cong.Rec. H33035 (1976). The legislation that became the 1978 Amendments was enacted in the second session of the 95th Congress after the Senate and House bills (S.9 and H.R. 1614) were reconciled in conference. *See* H.R.Rep.No.1474, 95th Cong., 2d Sess. (1978) (Conference Report). In the respects material here the enacted legislation is basically the same as H.R.1614, reported in H.R.No.590, *supra* n.8. *Compare id.* at 17 (section 18 as it appeared in H.R.1614) *with* 43 U.S.C. § 1344 (codification of section 18). The Senate Report on S.9 is S.Rep.No.284, *supra* n.9.

**23.** Pub.L.No.95–372, 92 Stat. 629 (1978) (codified in 43 U.S.C. § 1331 *et seq.*).

**24.** 43 U.S.C. § 1332(3); S.Rep.No.284, *supra* n.9, at 42–43; *see North Slope Borough v. Andrus,* 642 F.2d 589, 595 n.17 (D.C.Cir.1980).

**25.** 43 U.S.C. § 1802.

sions relating to such activities, in order to anticipate, ameliorate, and plan for the impacts of such activities;

(6) assure that States, and through States, local governments, which are directly affected by exploration, development, and production of oil and natural gas are provided an opportunity to participate in policy and planning decisions relating to management of the resources of the Outer Continental Shelf;

(7) minimize or eliminate conflicts between the exploration, development, and production of oil and natural gas, and the recovery of other resources such as fish and shellfish;

(8) establish an oilspill liability fund to pay for the prompt removal of any oil spilled or discharged as a result of activities on the Outer Continental Shelf and for any damages to public or private interests caused by such spills or discharges;

(9) insure that the extent of oil and natural gas resources of the Outer Continental Shelf is assessed at the earliest practicable time; and

(10) establish a fishermen's contingency fund to pay for damages to commercial fishing vessels and gear due to Outer Continental Shelf activities.

To achieve the expeditious but orderly development of OCS resources, the 1978 Amendments provide structure for every conceivable step to be taken on this path, from promulgation of a five-year leasing program,[26] to the lease sale stage,[27] to the exploration process,[28] to development and production,[29] to sale of recovered minerals,[30]

to ensure that the Secretary takes into account all relevant policy considerations and the views of all interested persons, the 1978 Amendments provide for participation in the OCS process by Congress,[31] affected state and local governments,[32] relevant federal agencies,[33] and the public.[34]

## II. THE LEASING PROGRAM

### A. *An overview of section 18.*

As is apparent from the foregoing brief summary, the procedures embodied in the 1978 Amendments are pyramidic in structure, proceeding from broad-based planning to an increasingly narrower focus as actual development grows more imminent. The first important step in this process is the one with which we are primarily concerned today—preparation of the five-year leasing program pursuant to section 18.

Section 18 "establishes a process which will permit the Secretary of Interior to weigh energy potential, and other benefits against environmental and other risks in determining how, when and where oil and gas should be made available from the various Outer Continental Shelf areas to meet national energy needs."[35] It requires the Secretary to prepare, maintain and periodically revise a leasing program consisting of a schedule of proposed sales, indicating, "as precisely as possible, the size, timing and location of leasing activity which he determines will best meet national energy needs for the five-year period following its approval or reapproval."[36] The Secretary must prepare and maintain the program consistent with four basic principles:

26. *See* 43 U.S.C. § 1344.

27. *See* 43 U.S.C. § 1337.

28. *See* 43 U.S.C. § 1340.

29. *See* 43 U.S.C. § 1351.

30. *See* 43 U.S.C. § 1353.

31. *See* 43 U.S.C. §§ 1337(4)(A), 1343, 1344(d)(2).

32. *See* 43 U.S.C. §§ 1340(c)(1), 1344(c)(d), 1345, 1351(a)(f)(g), 1352(d).

33. *See* 43 U.S.C. §§ 1334(f), 1337(c), 1344(d), 1346, 1347, 1348.

34. *See* 43 U.S.C. §§ 1344(f), 1349.

35. H.R.Rep.No.1474, *supra* n.22, at 103 (1978), U.S.Code Cong. & Admin.News 1978, p. 1702; *accord*, H.R.Rep.No.590, *supra* n.8, at 149; S.Rep.No.284, *supra* n.9, at 75.

36. 43 U.S.C. § 1344(a).

(1) Management of the outer Continental Shelf shall be conducted in a manner which considers economic, social, and environmental values of the renewable and nonrenewable resources contained in the outer Continental Shelf, and the potential impact of oil and gas exploration on other resource values of the outer Continental Shelf and the marine, coastal, and human environments.

(2) Timing and location of exploration, development, and production of oil and gas among the oil- and gas-bearing physiographic regions of the outer Continental Shelf shall be based on a consideration of—

(A) existing information concerning the geographical, geological, and ecological characteristics of such regions;

(B) an equitable sharing of developmental benefits and environmental risks among the various regions;

(C) the location of such regions with respect to, and the relative needs of, regional and national energy markets;

(D) the location of such regions with respect to other uses of the sea and seabed, including fisheries, navigation, existing or proposed sealanes, potential sites of deepwater ports, and other anticipated uses of the resources and space of the outer Continental Shelf;

(E) the interest of potential oil and gas producers in the development of oil and gas resources as indicated by exploration or nomination;

(F) laws, goals, and policies of affected States which have been specifically identified by the Governors of such States as relevant matters for the Secretary's consideration;

(G) the relative environmental sensitivity and marine productivity of different areas of the outer Continental Shelf; and

(H) relevant environmental and predictive information for different areas of the outer Continental Shelf.

(3) The Secretary shall select the timing and location of leasing, to the maximum extent practicable, so as to obtain a proper balance between the potential for environmental damage, the potential for the discovery of oil and gas, and the potential for adverse impact on the coastal zone.

(4) Leasing activities shall be conducted to assure receipt of fair market value for the lands leased and the rights conveyed by the Federal Government.[37]

Section 18 also establishes a mechanism whereby state governments, among others, are authorized to offer suggestions and comments on the development of the leasing program. Under section 18(c), the Secretary is required, when preparing a proposed leasing program, to "invite and consider suggestions for such program" from the Governors of any state which might be affected thereby.[38] The Secretary is also obliged, after he has drawn up the proposed program and at least sixty days before he publishes it in the Federal Register, to submit it to the Governor of each affected state for review and comment.[39] If any such Governor submits timely comments requesting modification of the proposed program, the Secretary must reply in writing, granting or denying the request in whole or in part, "and stating his reasons therefor."[40] Under section 18(d), states may also submit comments and recommendations as to any aspect of the proposed program within ninety days after it is published in the Federal Register.[41] The Secretary must then submit the proposed program and any comments received thereon to the Congress and the President at least sixty days before he approves it, indicating why any specific recommendation of a state government was not accepted.[42]

---

37. *Id.*

38. 43 U.S.C. § 1344(c)(1).

39. 43 U.S.C. § 1344(c)(2).

40. *Id.*

41. 43 U.S.C. § 1344(d)(1).

42. 43 U.S.C. § 1344(d)(2).

Once the Secretary approves the leasing program, it achieves important practical and legal significance. No lease may be issued for any area unless the area is included in the approved leasing program and unless the lease contains provisions consistent with the approved program.[43] The approved program also becomes the basis for future planning by all affected entities, from federal, state and local governments to the oil industry itself. Compliance with the mandates of section 18, therefore, is extremely important to the expeditious but orderly exploitation of OCS resources.

B. *Development of the 1980–1985 Leasing Program.*

The leasing program challenged in this litigation was developed over a 20-month period. The major stages in this development were preparation of two Draft Proposed Programs (March and May 1979), a Proposed Program (June 1979), a Proposed Final Program (April 1980), and a Final Program (June 1980). An Environmental Impact Statement (EIS) was also prepared, the draft of which was issued in August 1979 and the final statement in January 1980.

Development of the first Draft Proposed Program began in October 1978, when the Secretary, pursuant to section 18(c)(1), requested information from interested Governors, federal agencies, and private parties. Pursuant to section 18(c)(2), the Secretary then submitted his first Draft Proposed Program, proposing 26 sales over five years, to the Governors of affected states in early March 1979.[44]

In April 1979, President Carter delivered his second Energy Message to the nation and directed the Secretary to increase the amount of proposed acreage over that contained in the first Draft Proposed Program.[45] Shortly thereafter the Secretary directed his staff to develop alternative leasing schedules to meet the President's directive,[46] resulting in the development of the second Draft Proposed Program in May, 1979. In June 1979, the Secretary submitted his proposed Program, calling for a total of 30 sales and an acceleration of leasing in frontier areas, to the Governors of affected states and other interested persons.[47] Extensive Comments were then received by Secretary Andrus on the Proposed Program.

In August, 1979, a Draft Environmental Impact Statement was issued on the Proposed Program. In January 1980, the staff of the House Ad Hoc Select Committee on the OCS issued a study entitled "Offshore Oil and Gas in the Five-Year Leasing Program and Implementation of the Outer Continental Shelf Lands Act Amendments of 1978."[48] In this study, which was endorsed by the Committee Chairman and ranking member, the Committee staff recommended a leasing schedule involving more sales and earlier entry into frontier areas than the Secretary's June 1979 Proposed Program.[49] The Final Environmental Impact Statement (FES) was also issued in January, 1980.

Materials to assist the Secretary in making his decision on the Final Program were then assembled in February 1980 and submitted to the Secretary. These included, among other things, a Secretarial Issue Document (SID), describing 12 alternative leasing schedules and pertinent decisional

---

**43.** 43 U.S.C. § 1344(d)(3).

**44.** Letter from Secretary Andrus to Governors, Joint Appendix (App.) at 202–98.

**45.** *See* Memorandum from Secretary Andrus to Department of Interior officials (April 12, 1979), App. at 356.

**46.** *Id.* (urging study of "possibility of moving into frontier areas faster than proposed under the current draft" and "best effort we can make to move quickly into frontier areas where the potential for hydrocarbon discovery is highest"), App. at 356.

**47.** *See* Announcement of June Draft Proposed Program (News Release June 8, 1979), App. at 692.

**48.** *See* Brief of Respondents at 16.

**49.** *Id.* at 16–18.

information;[50] the Federal Environmental Impact Statement; and a summary of the comments received on the Proposed Program, and on the draft and final environmental impact statements.

The Secretary then decided upon a Proposed Final Program, which he transmitted to the President and Congress, as required by section 18(d)(2), on April 4, 1980. The program scheduled 36 proposed lease sales for the period from June 1980 through May 1985, covering virtually the entire Outer Continental Shelf, with the exception of the Florida Straits, the Southern Aleutian Shelf in Alaska, and the area seaward of the Washington and Oregon coasts. All these excluded areas possessed a very low industry rating for hydrocarbon potential.[51]

During the 60-day statutory period that the program was before Congress, oversight hearings were held by the House Ad Hoc Select Committee on the OCS. The committee chairman and the ranking minority member both expressed the view that the leasing was "inadequate" because it was not as aggressive as the Select Committee Staff had recommended in its January 1980 report.[52]

On June 16, 1980, after the expiration of the 60-day congressional consideration period specified in section 18(d)(2), the Secretary approved the Final Program. Its leasing schedule is essentially the same as that contained in the April 1980 Proposed Final Program, specifying 11 proposed sales in the Gulf of Mexico, 6 in the Atlantic, 4 off California, 10 off Alaska, and 5 reoffering sales.[53]

## III. THE STANDARD OF REVIEW

■ Section 23(c) of the Act provides: (c)(1) Any action of the Secretary to approve a leasing program pursuant to § 1344 of this Title shall be subject to judicial review only in the United States Court of Appeals for the District of Columbia.

\* \* \* \* \* \*

(6) The Court of Appeals conducting a proceeding pursuant to this subsection shall consider the matter under review solely on the record made before the Secretary. *The findings of the Secretary, if supported by substantial evidence, shall be conclusive.* The court may affirm, vacate, or modify any order or decision or may remand the proceedings to the Secretary for such further action as it may direct.[54]

Relying upon this language, petitioners contend that the "substantial evidence" test exclusively controls this case. The Secretary and intervenors, however, contend that the substantial evidence standard is inapplicable because section 18 does not require the Secretary to make any "findings." In their view, the "arbitrary and capricious" test exclusively governs our scrutiny of the leasing program. We reject both of these extremes and conclude that section 23(c)(6) calls for a hybrid standard of review, at least insofar as section 18 is concerned.

---

**50.** App. at 1515–1709.

**51.** Letter from Secretary Andrus to Governors of Affected States (March 9, 1979), App. at 210.

**52.** Brief of Respondents at 20–21 n.13.

**53.** See Announcement of Final Program (News Release, June 18, 1979), App. at 1925. In greater detail, the proposed lease sale schedule by years is:

*1980*: A62 Gulf of Mexico; 55 Gulf of Alaska; 62 Gulf of Mexico;

*1981*: 53 Central and Northern California; RS–1; A66 Gulf of Mexico; 56 South Atlantic; 60 Cook Inlet; 66 Gulf of Mexico; 59 Mid-Atlantic;

*1982*: 67 Gulf of Mexico; RS–2; 68 Southern California; 69 Gulf of Mexico; 57 Norton Basin; 52 North Atlantic; 70 St. George Basin;

*1983*: 71 Beaufort Sea; 72 Gulf of Mexico; 60 Kodiak; 73 California; RS–3; 74 Gulf of Mexico; 75 North Aleutian Shelf; 76 Mid-Atlantic;

*1984*: 78 South Atlantic; 79 Gulf of Mexico; RS–4; 80 California; 81 Gulf of Mexico; 82 North Atlantic; 83 Navarin Basin;

*1985*: 84 Gulf of Mexico; 85 Chukchi Sea; 86 Hope Basin; RS–5.

*Id.* The "RS" designation signifies a reoffering sale, where tracts outside the Gulf of Mexico which received no bids in earlier sales, or for which bids had been rejected, would be reoffered for lease sale.

**54.** 43 U.S.C. § 1349(c) (emphasis added).

The issue before us is not as clear the the language of section 23(c)(6) would appear to make it because of the somewhat peculiar relationship between section 18 and section 23(c)(6). Section 18 establishes a decision-making process quite similar to informal rulemaking under the Administrative Procedure Act. It provides the Secretary with broad standards to govern promulgation of the leasing program—it must best meet national energy needs and be consistent with enumerated principles—but leaves it to the Secretary to devise a program satisfying these broad standards. Section 18 also directs that the program be developed through a procedure resembling informal rulemaking; the Secretary is instructed to develop a proposed leasing program, to publish it in the Federal Register, to accept comments thereon from affected or interested parties, to respond to those comments, and to then approve a final leasing program setting forth a schedule of proposed lease sales for the next five years. The underlying record consists in large parts of studies, raw empirical data, predictive analyses, and descriptive information. Elements of the adversary process, such as the rules of evidence, the opportunity for cross-examination and the like, are not provided for in section 18 and were not used by the Secretary. Somewhat surprisingly, however, section 23(c)(6) provides for review of the leasing program under a standard traditionally associated with adjudicatory or formal rulemaking proceedings—the substantial evidence test. Our task, therefore, is to reconcile these seemingly contradictory provisions in a manner which takes into account the nature of the underlying administrative proceeding but which also fully effectuates Congress' intent.

Fortunately, we have travelled down this path once before. In *Industrial Union Department, AFL–CIO v. Hodgson*,[55] we considered the scope of review of health standards promulgated under the Occupational Safety and Health Act of 1979 (OSHA). Because we find Judge McGowan's discussion in *Hodgson* applicable to the present case, we quote therefrom at some length:

OSHA sets forth general policy objectives and establishes the basic procedural framework for the promulgation of standards, but the formulation of specific substantive provisions is left largely to the Secretary. The Secretary's task thus contains "elements of both a legislative policy determination and an adjudicative resolution of disputed facts." *Mobil Oil Corp. v. FPC*, 157 U.S.App.D.C. 235, 254, 483 F.2d 1238, 1257 (1973). Although in practice these elements may so intertwine as to be virtually inseparable, they are conceptually distinct and can only be regarded as such by a reviewing court.

From extensive and often conflicting evidence, the Secretary in this case made numerous factual determinations. With respect to some of those questions, the evidence was such that the task consisted primarily of evaluating the data and drawing conclusions from it. The court can review that data in the record and determine whether it reflects substantial support for the Secretary's findings. But some of the questions involved in the promulgation of these standards are on the frontiers of scientific knowledge, and consequently as to them insufficient data is presently available to make a fully informed factual determination. Decision making must in that circumstance depend to a greater extent upon policy judgments and less upon purely factual analysis.[18] Thus, in addition to currently unresolved factual issues, the formulation of standards involves choices that by their nature require basic policy determinations rather than resolution of factual controversies. Judicial review of inherently legislative decisions of this sort is obviously an undertaking of different dimensions.

18 Where existing methodology or research in a new area of regulation is deficient, the agency necessarily enjoys broad discretion to attempt to formulate a solution to the best of its ability on the basis of available information. *Permian Basin Area Rate Cases*, 360 U.S. 747, 811, 88 S.Ct. 1344, 1383, 20 L.Ed.2d 312 (1968).

**55.** 499 F.2d 467 (D.C.Cir.1974).

\* \* \* \* \* \*

Regardless of the manner in which the task of judicial review is articulated, policy choices . . . are not susceptible to the same type of verification or refutation by reference to the record as are some factual questions. Consequently, the court's approach must necessarily be different no matter how the standards of review are labeled. That does not mean that such decisions escape exacting scrutiny, for, as this court has stated in a similar context:

This exercise need be no less searching and strict in its weighing of whether the agency has performed in accordance with the Congressional purposes, but, because it is addressed to different materials, it inevitably varies from the adjudicatory model. The paramount objective is to see whether the agency, given an essentially legislative task to perform, has carried it out in a manner calculated to negate the dangers of arbitrariness and irrationality in the formulation of rules for general application in the future.

*Automotive Parts & Accessories Ass'n v. Boyd,* 132 U.S.App.D.C. 200, 407 F.2d 330, 338 (1968).

We do not understand Congress to have in this instance nullified this approach for all purposes by directing substantial evidence review. As noted above, that provision is important as an indication of how we should approach certain kinds of questions and what kind of record we should demand of the Secretary. But it is surely not to be taken as a direction by Congress that we treat the Secretary's decision making . . . as something different from what it is, namely, the exercise of delegated power to make within certain limits decisions that Congress normally makes itself, and by processes, as the courts have long recognized and accepted, peculiar to itself. A due respect for the boundaries between the legisla-

tive and the judicial function dictates that we approach our reviewing task with a flexibility informed and shaped by sensitivity to the diverse origins of the determinations that enter into a legislative judgment.

What we are entitled to at all events is a careful identification by the Secretary, when his proposed standards are challenged, of the reasons why he chooses to follow one course rather than another. Where that choice purports to be based on the existence of certain determinable facts, the Secretary must, in form as well as substance, find those facts from evidence in the record. By the same token, when the Secretary is obliged to make policy judgments where no factual certainties exist or where facts alone do not provide the answer, he should so state and go on to identify the considerations he found persuasive.[56]

Applying the principles set forth in *Hodgson* to a section 18 leasing program, we think the standard of review may be fairly summarized as follows. When reviewing findings of ascertainable fact made by the Secretary, the substantial evidence test guides our inquiry. When reviewing the policy judgments made by the Secretary, including those predictive and difficult judgmental calls the Secretary is called upon to make, we will subject them to searching scrutiny to ensure that they are neither arbitrary nor irrational—in other words, we must determine whether "the decision is based on a consideration of the relevant factors and whether there has been a clear error of judgment."[57]

██ Finally, in reviewing the leasing program, the Secretary's interpretation of section 18 or its component provisions may be in issue. In passing thereon, we adhere to the principle that the interpretation of a statute by those entrusted with its administration is entitled to substantial deference.[58]

**56.** 499 F.2d at 474–476 (some footnotes omitted).

**57.** *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971).

**58.** *See, e.g., Griggs v. Duke Power Co.,* 401

We also bear in mind, however, that the interpretation of statutes is a matter which ultimately lies in the province of the judiciary.[59] As the Supreme Court has declared, the courts are the final authorities on issues of statutory construction, *FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 385, [85 S.Ct. 1035, 1042, 13 L.Ed.2d 904] and "are not obliged to stand aside and rubberstamp their affirmance of administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the Congressional policy underlying a statute." *NLRB v. Brown*, 380 U.S. 278, 291, 85 S.Ct. 980, 988, 13 L.Ed.2d 839.[60]

An administrative interpretation of a statute which does not effectuate the intent of Congress must fall.[61]

## IV. DID THE SECRETARY COMPLY WITH SECTION 18 IN PREPARING THE LEASING PROGRAM?

Petitioners argue that the Secretary's compliance with section 18 was flawed in several respects. First, they argue that he failed to specify the location of two proposed lease sales on the leasing program with the precision required by section 18(a). Second, they contend that the leasing program is not consistent with the principles set forth in sections 18(a)(2) and (a)(3), in that the Secretary 1) either misinterpreted or failed to consider certain factors enumerated in section 18(a)(2);[62] 2) failed to actually base the leasing program upon the section 18(a)(2) factors; and 3) failed to select the timing and location of the proposed lease sales so as to achieve a proper balance among the potential for discovery of oil and gas, environmental damage, and adverse impact on the coastal zone as required by section 18(a)(3).[63] Finally, petitioners contend that the Secretary failed to respond to their comments and recommendations in the manner required by sections 18(c) and (d). We address these arguments seriatim.

### A. *Specificity of the Program.*

■ The leasing program designates 1983's proposed lease sale 73 and 1984's proposed lease sale 80 as simply "California." Petitioners contend that this designation violates the requirement of section 18(a) that the leasing program indicate the location of leasing activity "as precisely as possible." Petitioners point out that California has 1100 miles of coastline, consisting of a largely rural, undeveloped coast in the northern and central parts of the state and a highly urbanized coast in the southern part. Because of the great diversity in the environmental and socioeconomic characteristics of these areas, as recognized by the final environmental impact statement prepared in connection with the program,[64] petitioners argue that the Secretary must identify the location of these two proposed sales with greater specificity. They note that greater precision is possible, because the Secretary designated the 1981 and 1982 proposed sales as taking place in either "Central and Northern California" or "Southern California."[65]

U.S. 424, 433–34, 91 S.Ct. 849, 854–55, 28 L.Ed.2d 158 (1971); *United States v. City of Chicago*, 400 U.S. 8, 10, 91 S.Ct. 18, 20, 27 L.Ed.2d 9 (1970); *Udall v. Tallman*, 380 U.S. 1, 4, 85 S.Ct. 792, 795, 13 L.Ed.2d 616 (1965).

**59.** *See, e.g., Barlow v. Collins*, 397 U.S. 159, 166, 90 S.Ct. 832, 837, 25 L.Ed.2d 192 (1970).

**60.** *Volkswagenwerk AktienGeselleschaft v. FMC*, 390 U.S. 261, 272, 88 S.Ct. 929, 935, 19 L.Ed.2d 1090 (1968).

**61.** *See id.; McGinness v. ICC*, 662 F.2d 853 (D.C.Cir., 1981); *Alabama Power Co. v. Costle*, 636 F.2d 323, 374–75 (D.C.Cir. 1979); *cf. Odin v. United States*, 656 F.2d 798 (D.C.Cir. 1981) (agency interpretation of regulation in a manner inconsistent with terms of parent legislation struck down).

**62.** Specifically, sections 18(a)(2)(B), (C), (D), (F), and (G).

**63.** Petitioners do not argue that the Secretary erred in determining that the leasing program best meets national energy needs, or that the program is inconsistent with the principles of sections 18(a)(1) and (a)(4).

**64.** *See, e.g.*, FES at 171–175; 211–215.

**65.** *See* n.53 *supra.*

The Secretary concedes that it was indeed possible to make a more limited area designation for sales 73 and 80.[66] He asserts, however, that a more precise designation would not have served national energy needs, for it would have deprived him of the "flexibility" to assess at a later date which areas off California should be opened for leasing in 1983 and 1984. The Secretary also notes that the program's scheduling of proposed lease sales for simply the "Gulf of Mexico," an area which encompasses more territory than the designation "California," has not been challenged as violative of section 18(a).

We turn first, as we must, to the language of the statute, "the most important manifestation of Congressional intent."[67] It unambiguously directs the Secretary to specify the location of leasing activity "as precisely as possible." Although this language implicitly recognizes that absolute precision is unattainable at the program stage, it also reflects that Congress intended the Secretary to strive to achieve that goal to the extent he can at the program stage. As the Secretary acknowledges,[68] section 18(a)'s specificity requirement serves to notify state and local governments and other affected or interested groups of impending OCS activities off their shores in order to enable them to prepare and plan for its arrival and accompanying dislocations. Although the Secretary argues that the use of unnecessarily expansive area designations does not interfere with this purpose because such designations provide notice to every person located therein, we find this argument unpersuasive. First, the very breadth of the designation diminishes the possibility that any particular locality will be affected, and reduces the significance of any notice accordingly. Second, use of unnecessarily broad area designations may actually hinder participation and planning by affected entities, since they may be unable or unwilling to devote their limited resources to participation and planning on the basis of a signal so broad and undifferentiated that it may, in the end, portend no impact on their locality at all. Third, this argument, taken to its logical conclusion, would sanction a leasing program consisting of a schedule of proposed lease sales designated as merely "Atlantic," "Pacific," "Alaska," and "Gulf of Mexico." While these designations may indeed, in some sense, place the entire nation on notice; they hardly satisfy the requirement that the location of leasing activity be specified "as precisely as possible."

Regarding the Secretary's expressed need for future flexibility, if he presently concludes that a basis therefor must currently be established, he should at this time designate additional leasing areas as precisely as present information supports.

We need not attempt to define today, however, the degree of exactitude compelled by section 18(a). It is enough to decide this case that the Secretary concedes greater specificity is possible, and has employed greater specificity in designating the other proposed sales scheduled for the waters off California. Sales 73 and 80 should be identified with commensurate precision.

B. *Consistency with the Principle of Sections 18(a)(2).*

Petitioners contend that the Secretary failed to prepare the leasing program in a manner consistent with the principle of section 18(a)(2). Before we can treat this argument in detail, however, we must first determine the precise manner in which section 18(a)(2) applies to the preparation of a leasing program.

As noted above, section 18(a) states that "the leasing program shall be prepared . . . in a manner consistent with the [ ] principle [ ] [that]:

. . . .

---

66. Brief of Respondents at 91.

67. *Lawrence v. Staats*, 640 F.2d 427, 436 (D.C. Cir. 1981) (MacKinnon, J., concurring); *accord,*

*Association of Bituminous Contractors v. Andrus*, 581 F.2d 853, 861 (D.C.Cir. 1978).

68. Brief of Respondents at 94.

(2) Timing and location of exploration, development, and production of oil and gas among the oil- and gas-bearing physiographic regions of the outer Continental Shelf shall be based on a consideration of [the following eight factors]." [69]

Petitioners argue that this language poses two related duties upon the Secretary in developing a leasing program; first, he must fully consider the eight factors listed in section 18(a)(2), and second, he must actually base the leasing program on the result of his consideration of these factors. In other words, the factors listed in section 18(a)(2) are matters which the Secretary must address at the leasing program stage, and are matters which the Secretary must factor into his decision-making process when drawing up the leasing program.

The Secretary takes a different view of section 18(a)(2)'s relevance at the program stage. He notes that section 18(a)(2) speaks of the timing and location of "exploration, development, and production," and not the timing and location of proposed lease sales. Exploration, development, and production, the Secretary points out, are activities which occur during future stages of OCS exploitation, after a leasing program has been developed. Since section 18 only requires that the leasing program be prepared in a manner "consistent with" the principle that these future activities be based upon consideration of the factors enumerated in section 18(a)(2), the Secretary concludes that he has an obligation, at the program stage, only

to *consider* all of the factors enumerated in Section 18(a), to the extent that probative information exists now. Many of the elements, however, have viability only in connection with later stages of OCS activities. Thus his obligation now is to assure that his leasing program permits sufficient and proper consideration of

those factors at their appropriate time in the future.

\* \* \* \* \* \*

At the time of the leasing schedule, therefore, it is important to identify and *consider* the enumerated issues. This enables the Secretary to determine which, if any, factors present an absolute impediment to scheduling an area; which, if any, require particular studies or adjustments that would warrant placement of the area on the schedule later; and which, if any, depend on highly variable or speculative matters which are best addressed at a specific future time.[70]

■ We conclude that Congress intended the Secretary to consider all factors listed in section 18(a)(2) in developing the leasing program, and did not envision the deferral thereof until some later date. We also conclude that the Secretary must base the leasing program upon the result of his consideration of these factors.

The legislative history of section 18 speaks quite clearly to both these points. For example, the House Committee Report explains:

*In determining the timing and location of future activities in the various geographic regions, the leasing program should consider* the existing characteristics of such regions, and the need to share developmental benefits and risks among the various regions, the location of these regions with respect to the needs of the various regional markets, the locations of the regions with respect of other uses of sea and seabed, the interest of developers in a particular area. . . . the environmental nature of the various OCS areas, and any relevant baseline or predictive information.

In addition, the Secretary is to consider the views of affected states as to any relevant law, goals or policies which they have identified specifically and as to the

---

**69.** 43 U.S.C. § 1344(a)(2).

**70.** Brief of Respondents at 33, 47–48 (emphasis in original). Section 18(a)(2)(A) provides that

"[t]iming and location . . . shall be based on a consideration of . . . *existing information* . . . ." 43 U.S.C. § 1344(a)(2)(A) (emphasis added).

effect of any approved coastal zone management program.[71]

In addition, the Conference Report provides:

*Considerations*

The House amendment includes *among the considerations for a leasing program*, the sufficiency of resources including equipment and capital to assure exploitation expeditiously. The Senate bill contains no comparable provision. The House receded and the conference report contains no such provision.

The House amendment includes *among the considerations for a leasing program*, the relative environmental sensitivity and marine productivity of different areas. The Senate bill contains no comparable provision. The conference report is the same as the House amendment.

The House amendment includes *among the consideration[s] for a leasing program* the policies and plans under the Coastal Zone Management Act. The Senate bill contains no comparable provision. The conference report follows the House amendment and contains no such specific provision as it is included within the consideration of "laws, goals, and policies of affected States."[72]

The language of section 18(a)(2) also supports this interpretation, in that the factors specified in section 18(a)(2) are of such a nature that, practically, they can be fully analyzed only at the program stage. For example, section 18(a)(2)(B) requires consideration of "an equitable sharing of developmental benefits and environmental risks among the various regions,"[73] and section 18(a)(2)(G) mandates consideration of "the *relative* environmental sensitivity and marine productivity of the different areas of the outer Continental Shelf."[74] These factors by their very terms require the Secretary to engage in a *comparative* analysis, based on "existing information," of the various OCS regions, and to strike an equitable allocation of benefits and risks *among the various regions*. This sort of analysis is one that the Secretary logically must undertake when he is considering the various regions at the one and the same time; namely, at the program stage. When a decision is being made or a particular lease sale, or a particular exploration, development or production plan, the focus of the inquiry is on the propriety of that particular lease sale or plan.[75] The Secretary failed to explain how he can determine whether his entire nationwide schedule of proposed lease sales strikes an equitable balance among the various OCS regions in the context of a decision on the placement of a particular exploratory well.

Under these circumstances, we think it reasonable to conclude that Congress' reference to the "[t]iming and location of exploration, development and production" in section 18(a)(2) merely reflects its recognition that the timing and location of the proposed lease sales specified in the leasing program affects the timing and location of exploration, development, and production. In other words, for the timing and location of exploration, development and production to be based upon the factors listed in section

---

71. H.R.Rep.No. 590, *supra* n.8, at 149, U.S. Code Cong. & Admin.News 1978, p. 1555 (emphasis added).

72. H.R.Rep.No.1474, *supra* n.22, at 103, U.S. Code Cong. & Admin.News 1978, p. 1703 (emphasis added); *see also* H.R.Rep.No.590, *supra* n.8, at 52, U.S.Code Cong. & Admin.News 1978, p. 1459 ("In general, *the whole OCS process, from preparation of a leasing program*, selection of tracts for leasing, promulgation and enforcement of regulations, and review of activities, *must consider environmental consequences—to the waters, to the air, to adjacent coastal areas, and to the living resources*.") (emphasis added); S.Rep.No.284, *supra* n.9, at 75 ("Subsection 18(a) directs the Secretary to prepare a 5-year leasing program. It sets out *the policies to be followed in preparing the program*, including orderly development of energy resources, *environmental protection*, receipt of fair market value, public participation, and intergovernmental coordination.") (emphasis added).

73. 43 U.S.C. § 1344(a)(2)(B) (emphasis added).

74. 43 U.S.C. § 1344(a)(2)(G) (emphasis added).

75. *See* 43 U.S.C. §§ 1337 (lease sale), 1340 (exploration plan), 1351 (development and production plan).

18(a)(2), the leasing program itself must of necessity also be based thereon. Further support for this analysis is found in the language in section 18(a)(2) speaking to the "[t]iming and location of exploration, development, and production . . . *among the . . . regions* of the outer Continental Shelf." [76] Once again, this nationwide allocation of OCS activities is performed at the leasing program stage.

We fully recognize that at the leasing program stage, much of the information culled from an assessment of the section 18(a)(2) factors may be predictive or speculative in nature. This does not mean, however, that consideration of any particular factor may be deferred until some later date. The Secretary's authority is to consider all regions and act on the basis of "existing information." Although the continual collection and assimilation of pertinent information must of course continue throughout the OCS process, and although the speculative nature of any information may well affect the weight the Secretary attaches thereto in drawing up the leasing program, section 18(a)(2) nonetheless requires the Secretary at the program stage to consider, each factor listed therein on the basis of the best information available, and to base the leasing program upon the information thereby obtained.

(1) *Did the Secretary misinterpret or fail to consider the factors enumerated in section 18(a)(2)?*

(a) *Section 18(a)(2)(B).*

Petitioners contend that the Secretary misinterpreted the directive of section 18(a)(2)(B) that, in developing the leasing program, he consider "an equitable sharing of developmental benefits and environmental risks among the various regions." The Secretary interpreted this factor as follows:

Subpart (2)(B) * * * supports the contention that no one region is to bear the burden of supplying our nation with energy supplies, and that all regions should contribute to energy supplies unless the environmental risks are too high.

\* \* \* \* \* \*

The directive to share developmental benefits and environmental risks requires the Department to ensure that all regions of the country with economically recoverable deposits of hydrocarbons participate in the leasing program to the extent that environmental risks are not too high. This mandate addresses the historical inequity which has resulted from over-reliance on the Gulf of Mexico.[77]

Accordingly to the Secretary, the primary "environmental risk" to be considered here was the risk of occurrence of a major oil spill.[78] Considering this factor, the Secretary found that the probability of an oil spill related most directly to the quantity of oil likely to be produced in an area, and did not vary significantly on the basis of geography, weather, or geohazards.[79] The Secretary therefore argues that the risk of an environmentally damaging incident is largely equal nationwide.[80]

Petitioners argue that the Secretary defined "environmental risks" in an unduly narrow fashion. They assert that the environmental risks OCS activities pose to any region depend not only on the likelihood of an oil spill but also on an assessment of the *damage* such an oil spill would inflict. The amount of damage that would befall an area, according to petitioners, is a product of the area's environmental sensitivity. Thus, to determine the environmental risks posed to an area, petitioners argue that the Secretary must consider the likelihood of an oil spill, the environmental sensitivity of the area, and the damage which would result to that area if an oil spill occurred. Petitioners further contend that "an equitable sharing" of the environmental risks can only be brought about if the Secretary considers

---

**76.** 43 U.S.C. § 1344(a)(2) (emphasis added).

**77.** SID, Appendix II, at 3–4, App. at 1650–51.

**78.** SID at 25, App. at 1545.

**79.** FES at 145–46.

**80.** Brief of Respondents at 51.

the *relative* environmental sensitivity of the *various* OCS regions. Petitioners claim, however, that because the Secretary failed to consider the relative environmental sensitivity of the various OCS regions under section 18(a)(2)(G), he was unable to consider an equitable sharing of environmental risks.

We find ourselves in essential agreement with petitioners. We note initially that the Secretary's conclusion does not follow from his premises; that is, it does not follow from the fact that the likelihood of an oil spill is related to the quantity of oil present in a region that the risk of an oil spill is equal nationwide. Rather, it follows that the risk of an oil spill is greatest where the most oil is to be found, and we have been directed to nothing in the record which indicates that the amount of oil to be found in the various regions is approximately the same. Be that as it may, we must also conclude that the Secretary's interpretation of "environmental risks" is at odds with the plain meaning of the statutory language. A risk is commonly understood to mean the "exposure to the chance of injury or loss." [81] Injury or loss to the environment from an oil spill, however, does not flow from the mere mathematical possibility that the spill might occur; it depends upon both the *likelihood* of a spill and the *amount of damage* the spill would inflict. Indeed, the final environmental impact statement prepared by the Secretary states that "perhaps the most important" component of any oil spill risk analysis is an assessment of the potential damage to vulnerable resources.[82] And, as petitioners point out, this variable is in turn dependent on an assessment of the area's environmental sensitivity. For example, an oil spill in an area of high environmental sensitivity would cause greater damage and therefore pose greater environmental risks than an equivalent oil spill in an area of lesser environmental sensitivity.

Since the Secretary interpreted the term "environmental risk" contrary to the plain meaning of the statute, his consideration of this factor was flawed. Similarly, since the Secretary failed to consider the relative environmental sensitivity of the various OCS regions as required by section 18(a)(2)(G),[83] it follows that he failed to give proper consideration to the mandate of section 18(a)(2)(B) that environmental risks be "equitabl[y] shar[ed]" among the various OCS regions.

As for lease sales 73 and 80, of course, it is imperative as per the reasoning set out in IV A above that the Secretary more specifically identify the areas under consideration. That task once accomplished, the Secretary will be able to make a far more accurate assessment of the relative environmental sensitivities of the OCS regions in which those areas are located.

(b) *Section (a)(2)(C).*

■ Section 18(a)(2)(C) requires the Secretary to consider "the location of [OCS] regions with respect to, and the relative needs of, regional and national energy markets." The Secretary concluded that "there are no constraints on OCS production resulting from these considerations." [84] Petitioners contend that this determination is contrary to the evidence in the record, which allegedly shows that a West Coast oil glut is expected in the 1980's.

Our review of the record persuades us that the Secretary did consider this factor, and we find adequate support in the record for the Secretary's conclusion. The Secretary considered, among other things, a 387-page study of national and regional energy needs prepared by the Department of Energy, entitled "Federal Leasing and Outer Continental Shelf Energy Production Goals," in which DOE concluded that "the market situation does not constrain OCS production." [85] The Secretary also considered a specific analysis of the "Availabil-

---

**81.** Random House College Dictionary 1139 (1973 ed.).

**82.** FES at 149.

**83.** *See* pp. 1311–1313 *infra.*

**84.** SID, Appendix II, at 5, App. at 1652.

**85.** Administrative Record (A.R.) III, I, 4(h) at 19.

ity of Transportation Networks to Bring Oil and Gas to Market," [86] which explored the various avenues available, including pipelines and tankers, for bringing discovered resources to shore, and for transporting the landed resources to refinery and demand centers [87]. This analysis found no unresolvable problems to exist.[88]

We recognize that, to a considerable extent, the Secretary relied upon the projection of estimates and predictive and judgmental information. These characteristics, however, are inherent in most if not all of the factors listed in section 18(a)(2), including section 18(a)(2)(C). The location and needs of regional and national energy markets are matters which may change rapidly over the years, and which are often dependent on factors outside the Secretary's control—for example, the projections of the oil and gas supply contained in the OCS are speculative in nature; the demand for OCS resources may vary depending upon the price and level of imported oil and the political climate at the time its importation is desired or under consideration; the availability of transportation and refinery capacity may change depending upon the interaction of all these factors and a variety of others. Section 18 does not assume the Secretary possesses a crystal ball that will enable him to predict the future with absolute precision. He is not required to. He is required only to consider the factors set forth by Congress on the basis of the best "existing information" available. We conclude that the Secretary adequately considered the location and relative needs of regional and national energy markets.[89]

(c) *Section 18(a)(2)(D).*

█ Subsection (a)(2)(D) requires the Secretary to consider "the location of [OCS] regions with respect to other uses of the sea and seabed, including fisheries, navigation, existing or proposed sealanes, potential sites of deepwater ports, and other anticipated uses of the resources and space of the outer Continental Shelf." In his Proposed Final Program, the Secretary reported that

> The location of the planning areas with respect to other uses of the sea and seabed has been considered. We have concluded that other uses need not pose irresolvable conflicts causing any entire planning area to be excluded from the schedule. This is because of the extensive pre-sale and post-sale planning process followed by the Department, and the Department's ability to exclude tracts from leasing if there are local conflicts which cannot be resolved.[90]

In response to specific complaints expressing concern about potential conflicts between OCS activities and other uses of the sea and seabed, the Secretary identified means by which conflicts could be minimized. For example, with respect to alleged interference with Coast Guard sea lanes, the Secretary mentioned "subsea completions and slant drilling [as] operational alternatives." [91] The Secretary also referred to ongoing Coast Guard studies to determine whether "safe access routes" should be designated which would be paramount to lease rights.[92] With respect to potential conflicts between OCS activities and fishery interests, the Secretary adverted to a number of protective measures, including sale-specific lease stipulations, the Fisherman's Contingency Fund, and BLM regulations for leasing and pipeline rights-of-way.[93] The Secretary also cited the "experience in the Gulf of Mexico [which] shows that the

---

86. App. at 650–63.

87. *Id.*

88. *Id.* at 662.

89. Whether the Secretary fulfilled his conceptually distinct duty to base the leasing program upon his consideration of this factor is another question. See Part IV.B.2, *infra.*

90. Proposed Final OCS Oil & Gas Leasing Schedule, Enclosure 6 (April 1980) (Compliance with Section 18 of the OCS Lands Act, as amended), App. at 1824.

91. SID, Appendix II at 5, App. at 1652.

92. *Id.*

93. *Id.* at 1653.

fishing and offshore oil and gas industries can live side-by-side." [94]

In light of this discussion we must reject petitioners' assertion that the Secretary "offhandedly dismiss[ed]" the section 18(a)(2)(D) factor. In making this claim petitioners rely solely upon the evidence pertaining to alternative uses of the sea and seabed in the area of the Georges Bank. Yet, ironically, the source of all their information is the Secretary's own Final Environmental Statement, which first identifies the sea and seabed uses that potentially conflict with OCS activities, and then discusses measures to minimize the conflicts and the probable impacts of oil spills. [95] The Secretary's discussion and the record evidence fully support his contention that he considered the elements of section 18(a)(2)(D). [96]

#### (d) *Section 18(a)(2)(F).*

 Subsection (a)(2)(F) requires the Secretary to consider the "laws, goals, and policies of affected States which have been specifically identified by the Governors of such States as relevant matters for the Secretary's consideration." In his proposed leasing program the Secretary stated that

> The laws, goals and policies of affected States have been reviewed and considered in preparing the program and we have not identified any which would make inappropriate or preclude the initiation or continuation of planning for any of the potential sales in the proposed final leasing program. After the pre-sale planning is completed, we will be in a better position to assess whether a sale should go forward or not, whether certain areas should be excluded from leasing, or whether special lease terms and conditions should be required to provide extra protection to particular environmental values or resource uses. [97]

This conclusion followed from the following statement in the February 1980 Secretarial Issue Document:

> In regard to consideration of laws, goals or policies of affected States, we have not determined any absolute impediment to inclusion of any OCS area on the planning schedule. Also, it would be inconsistent with the Coastal Zone Management Act for any approved coastal plan to include provisions which would preclude an entire area from being considered as a candidate for leasing. While the Governors of some affected States have objected to inclusion of some area on the leasing schedule, when their views are balanced against national energy policy, there does not appear to be any reason to exclude the areas from the planning schedule. [98]

Petitioners argue that the Secretary failed to comply with section 18(a)(2)(F) by declining to delete from the program areas seaward of Northern and Central California which, they have alleged, cannot be developed in a manner consistent with state law. Development in these areas, they say, is inconsistent with California's approved Coastal Management plan and with California policy that development occur only where there are sufficient resources to justify the construction of pipelines, which California requires to preserve air quality and to minimize the risk of oil spills.

The Secretary responds that California's specific charges on this issue are best addressed at later points in the OCS decision-making process, in conjunction with specific proposed activities. The Secretary notes further that in the event of an actual conflict between a state and a federal licensee, the state has no veto; rather, the final decision on whether the licensee can proceed is made by the Secretary of Commerce. [99]

---

94. *Id.*

95. FES 207–08, 221–22.

96. *But see* n.89 *supra.*

97. Proposed Final Leasing Schedule, *supra* n.90, at 4, App. at 1824.

98. SID, Appendix II at 7, App. at 1654.

99. *See* 16 U.S.C. § 1456(c)(3).

We are satisfied that the Secretary adequately considered the potential impediments to exploration and development posed by state laws and policies. Although the Secretary did not deliver a result satisfactory to petitioners, it cannot be doubted that he assembled and analyzed data addressed to their concerns.[100]

(e) *Section 18(a)(2)(G).*

 Section 18(a)(2)(G) requires the Secretary to consider "the relative environmental sensitivity and marine productivity of different areas of the outer Continental Shelf." The statute provides no method by which environmental sensitivity and marine productivity are to be measured. But it does provide that these factors are to be considered in scheduling leasing activities "among" the OCS regions, and its use of the word "relative" confirms the evident meaning of this language—that the Secretary is to compare the environmental sensitivity and marine productivity of one OCS region with another.

 The Secretary reported that

The relative environmental sensitivity and marine productivity of the different OCS areas has been an important consideration in developing the leasing program. The areas have not been ranked as some have suggested since it is not meaningful to weigh and rank, for example, the Georges Bank fishery with the bird colonies of the Farallon Islands, the Pacific and Arctic whales, or the coral banks of the Gulf of Mexico. Furthermore, no consensus on such a ranking exists. Given the absence of meaningful measurements, non-comparability of values, and lack of agreement among experts, a sensitivity matrix was developed which went as far as we felt was credible in displaying relative environmental sensitivities of potential leasing areas. The matrix, together with the extensive material developed as a result of the

processes conducted under Section 18 and under NEPA, have been used to identify environmental sensitivities and to determine the earliest date when sufficient information would be available to permit a decision on whether to lease and under what terms and conditions.[101]

The matrix to which the Secretary referred analyzed relative environmental sensitivity and marine productivity within each of four major OCS regions: Atlantic, Pacific, Gulf of Mexico, and Alaska.[102] These four areas together include all of the individual OCS regions considered. Within the Atlantic region, for example, the matrix assessed, from "high" to "low," the sensitivity of the North Atlantic, Mid-Atlantic, South Atlantic, Blake Plateau, and Florida Straights regions in terms of commercial fishing, recreational fishing, marine mammal use, coastal birds, pelagic birds, and wetlands and estuaries. Individual OCS regions within the Pacific, Gulf of Mexico, and Alaska regions were similarly compared.

Petitioners complain that this method does not go far enough in that it makes only intra-region comparisons; for example, it does not compare the Atlantic region with the Pacific region, or the individual OCS regions within the Atlantic with the individual regions within the Pacific. The Secretary explained that

it would not be meaningful ... [to] compar[e] the environmental values of the specific biological resources of each individual OCS area.... First, comparison and weighing of various fishery species in the Alaskan OCS cannot be equated to the species of the Georges Bank since, in general, they are completely different resources, each with their own distinct values (e.g., crabs in Bristol Bay vs. lobsters in the North Atlantic).... Similarly, it is not meaningful to compare, by value or

---

**100.** *But see* n.89 *supra.*

**101.** Proposed Final Schedule, *supra* n.90 at 5, App. at 1825.

**102.** Memorandum from Assistant Secretary of Policy, Budget & Administration to Secretary Andrus (May 29, 1979), App. at 508–32.

rank, the Pacific or Arctic whales with the coral banks in the Gulf of Mexico.[103]

In essence, the Secretary stated it was impossible or impracticable or simply not useful to perform the comparison of relative environmental sensitivity and marine productivity required by the language of section 18(a)(2)(G). We find apt the observations made by this court in *Alabama Power Co. v. Costle:*

> This is not a circumstance of an agency seeking relief from a change which, after a good faith effort, it has found it cannot perform. It is, rather, an agency seeking vindication of an approach contrary to the explicit statutory design on the basis of its estimate of its lack of capacity to handle the task delegated to it. Before a court sanctions such actions, it will carefully study the governing statute ... to ascertain whether the statute authorizes approaches that deviate from the legislative mandate in response to concerns about feasibility.[104]

We held in *Alabama Power* that "[t]he agency's burden of justification in such a case is especially heavy." [105] We are not convinced that the Secretary has even approached that burden here.

First, we note that, despite his later claim of impossibility, the Secretary had before him, in May 1979, an assessment of the relative environmental sensitivity and marine productivity within the Atlantic, Pacific, Alaska, and Gulf of Mexico regions.[106] Although this comparison also involved resources with "distinct values", it was performed and produced data of use to a decisionmaker. In addition, analysis within a given region as large as the "Atlantic" or the "Pacific" may be just as complex as a comparative analysis between regions. Second, the Secretarial Issue Document itself included some rough comparisons among the OCS regions. For example, the North Atlantic, offshore California, and several areas offshore of Alaska were identified as areas in which bird populations were most sensitive to oil spills; the Chukchi Sea, North Aleutian Shelf, and St. Georges Basin were identified as the areas in which onshore lifestyles were most sensitive to OCS development. Other areas were labeled as "the most sensitive" areas or "relatively high sensitivity areas" with respect to endangered species, endangered marine mammals, recreation, and commercial fishing.[107] Third, the Secretary's staff was of the view that it was feasible to construct matrices to rate environmental factors and to assess their compatibility with oil and gas exploration and development. This approach was abandoned not because it was technically infeasible, but because of lack of time and lack of readily available information.[108] And finally, California, Massachusetts, and the Environmental Protection Agency all proposed ways in which the environmental sensitivity and marine productivity of the various OCS regions could be compared,[109] and the Council on Environmental Quality, as early as 1974, actually compiled a ranking among the various regions in terms of the environmental risks of OCS oil and gas development.[110]

In light of this record, we cannot condone the Secretary's refusal to comply with the

---

**103.** SID, Appendix II at 8–9, App. at 1655–56.

**104.** 636 F.2d 323, 359 (D.C.Cir.1979).

**105.** *Id.* at 359.

**106.** See pp. 1311–1312.

**107.** SID at 30, App. at 1550.

**108.** *Memorandum, supra* note 102, at 2, App. at 509.

**109.** California Commentary on Draft Environmental Impact Statement, App. at 1192–95; Massachusetts comments on March 1979 Draft Program (April 17, 1979) at 5–6; Letter from Environmental Protection Agency to Director of OCS Program Coordination (December 13, 1978) at 2, App. at 28.

**110.** *See* Statement of Russell W. Peterson, Chairman of Council of Environmental Quality, Before the Subcommittee on Minerals, Materials, and Fuels of the Senate Committee on Interior and Insular Affairs (ranking, from highest to lowest, the relative environmental risks of potential oil and gas operations at eight different locations on the Atlantic and Gulf of Alaska Outer Continental Shelves), *reprinted in* S.Rep.No.1140, *supra* n.22, at 59, 61.

congressional mandate of section 18(a)(2)(G) to consider relative environmental sensitivity and marine productivity. Lack of information, lack of time, and methodological imperfections all may make the consideration highly speculative, as will the difficulties inherent in comparing, to use the Secretary's example, coral reefs with arctic whales. But the difficulties inherent in this comparison were recognized by Congress when it stated, in the related provision of section 18(a)(3), that balancing of factors is to be performed "to the maximum extent practicable." All that is required is that the Secretary make a good faith determination of the relative environmental sensitivity and marine productivity of the various regions based upon the best "existing information" available to him. The statute does not require the Secretary to compile a top-to-bottom ranking among all OCS regions, but he must at least attempt to identify those areas whose environment and marine productivity are most and least sensitive to OCS activity.

(2) *Did the Secretary base the leasing program on the section 18(a)(2) factors?*

The areas covered by a leasing program (location) and the order in which they are opened up to leasing (timing) must be determined in accordance with the principles of section 18. By reasonably concluding that several of the section 18(a)(2) factors posed no absolute or categorical impediment to leasing a particular area, the Secretary fulfilled his duty to base the location of leasing among the regions on these factors. He failed, however, to properly consider other 18(a)(2) factors in making his location decisions. Moreover, the Secretary failed altogether to rely upon the environmental and coastal zone factors of section 18(a)(2) when he determined the timing of his program.

(a) *Location*

As explained in the Final Environmental Statement,

Resource potential, economic benefits, and industry interest [were] key determinants of where sales should be located. Taking into account the pre-sale planning which is necessary for first sales in frontier areas, we have attempted to select sale areas on the basis of resource potential, economic benefits, and interest in exploration, as indicated by industry responses.[111]

Petitioners cite this passage as proof that the Secretary read section 18(a)(2) out of the program development process, for a reliance upon resource potential, economic benefits, and industry interest omits any consideration of the coastal and environmental impact factors identified in sections 18(a)(2)(B), (D), (F), (G), or of the relative regional and national energy markets mentioned in section 18(a)(2)(C).

■ We reject petitioners' argument with respect to sections 18(a)(2)(C), (D), and (F). With respect to each of these sections, the Secretary determined that, on the basis of the information then available to him, the potential hurdles—whether a West Coast oil glut, vulnerable alternative uses of the sea and seabed, or conflicting State coast policies—were not necessarily insuperable. None of the posited impediments was "categorical" or "absolute," the Secretary determined, because conflicts could be resolved at one of several post-planning stages in the OCS development process. In making these determinations the Secretary did not unlawfully defer consideration of these factors insofar as *location* is concerned. He considered whether otherwise attractive areas should be subject to leasing and reasonably concluded, insofar as the factors identified in sections 18(a)(2)(C), (D), and (F) are concerned, that nothing compelled the exclusion of these areas from the leasing program.

No such conclusion was possible, however, with respect to sections 18(a)(2)(B) & (G), for the Secretary misinterpreted the meaning of section 18(a)(2)(B)'s mandate to consider "equitable sharing of developmental

---

**111.** FES, Appendix at 8, App. at 502.

benefits and environmental risks among the various regions" and flouted the section 18(a)(2)(G)'s directive to consider "the relative environmental sensitivity and marine productivity of different areas of the outer Continental Shelf". On remand the new Secretary of Interior should determine whether these factors, properly considered in conjunction with other 18(a)(2) factors, warrant the exclusion of any area from his leasing program.

### (b) Timing

The explanation in the May 1979 Proposed Program was that

> The timing of lease sales is influenced by seven key factors:
>
> 1. Sound energy policy calls for opening up offshore areas to oil and gas activity as soon as this can be responsibly done;
>
> 2. Sound energy policy calls for the leasing and development of areas yielding greater economic benefits earlier than less promising areas;
>
> 3. Relative ranking of areas according to resource potential and industry interest in exploration provides a key to the probability of areas being hydrocarbon prone;
>
> 4. Availability of technology for exploration and development, determines the timing of successful industry operations in different areas;
>
> 5. Availability of environmental and geotechnical data determines ability to plan for sales and analyze the possible impacts of development;
>
> 6. Statutory and policy requirements for preparation of lease sales cannot be met immediately and simultaneously for all areas; and
>
> 7. Sales in frontier areas should be spaced so that the results of initial exploration can be available for planning subsequent sales.[112]

None of these factors, obviously, incorporates the environmental and coastal zone impact considerations specified in section 18(a)(2). It was apparently the Secretary's belief that these considerations were merely "issues which need to be addressed in the planning process or . . . factors which could affect the precise timing of a sale."[113] As we have noted, this approach contradicts the statutory requirement that these considerations be taken into account at the programmatic stage; otherwise, the requirement that the Secretary select the timing of leasing "among the regions" is rendered meaningless.

In explanations accompanying the Proposed Final Program in April 1980, the Secretary claimed that timing and location were based on a consideration of oil and gas benefits and of costs broadly defined to include economic, environmental, and coastal zone impacts of exploration, development, and production.[114] Nowhere, however, does the Secretary indicate *how* this consideration occurred. What is more, the Secretary's final explanation of how timing was determined seems more consistent with the environmentally-blind scheme described in conjunction with the May 1979 proposed plan than with the terms of section 18(a)(2):

> In developing a leasing program, sales were scheduled by starting at the top of the resource potential rankings provided by USGA and industry and determining the earliest date when sufficient information, from the environmental studies program and other sources within and outside the department, would be available to permit a decision, in light of potential cost, of whether to lease and under what terms and conditions.[115]

Thus, although administrative exigencies were added to industry interest and resource potential as a consideration affecting the timing of leasing, the environmental

---

**112.** Memorandum from Assistant Secretary to Secretary Andrus on May 1979 Proposed Program (May 29, 1979), Tab 5 (Sizing, Timing, and Location of Sales), App. at 497–98; FES, Appendix I at 3–4.

**113.** SID, Appendix II at 2, App. at 1649.

**114.** See nn.127–28 & 131 *infra.*

**115.** Proposed Final Schedule, *supra* n.90, at 3, App. at 1823.

and coastal zone considerations identified in the statute are still conspicuous by their absence. The Secretary failed to base timing and location of leasing activities among the OCS regions on all of the factors listed in section 18(a)(2). We remand to the present Secretary for him to cure this prior deficiency.

C. *Consistency with the Principle of Section 18(a)(3).*

Section 18(a)(3) requires that the leasing program be prepared consistent with the principle that the Secretary shall select, "to the maximum extent practicable," the "timing and location of leasing . . . so as to obtain a proper balance between the potential for environmental damage, potential for the discovery of oil and gas, and the potential for adverse impact on the coastal zone." [116] These three elements are, in large part, a condensation of the factors specified in section 18(a)(2).[117]

Although section 18(a)(3) does not define the "proper balance" among these elements, some notion of its meaning can be derived from the policy and purposes of the Act. In passing the 1978 Amendments, Congress declared the policy of the United States to be that

> the outer Continental Shelf is a vital national resource . . . which should be made available for orderly and expeditious development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs.[118]

Implicit in this statement of policy is both an end and a means. The end is to develop the oil and natural gas resources of the OCS expeditiously. The means includes an administrative scheme that permits "detailed planning" by the federal government and concerned states "to minimize the potential conflicts and adverse impacts of OCS activities." [119]

The congressional purposes also reflect this primary emphasis on expeditious development of the OCS, qualified by the recognition of a need for measures to alleviate or minimize its adverse impacts. Those purposes are to:

(1) establish policies and procedures for managing the oil and natural gas resources of the Outer Continental Shelf which are intended to result in expedited exploration and development of the Outer Continental Shelf in order to achieve national economic and energy policy goals, assure national security, reduce dependence on foreign sources, and maintain a favorable balance of payments in world trade;

(2) preserve, protect, and develop oil and natural gas resources in the Outer Continental Shelf in a manner which is consistent with the need (A) to make such resources available to meet the Nation's energy needs as rapidly as possible, (B) to balance orderly energy resource development with protection of the human, marine, and coastal environments, (C) to insure the public a fair and equitable return on the resources of the Outer Continental Shelf, and (D) to preserve and maintain free enterprise competition;

(3) encourage development of new and improved technology for energy resource production which will eliminate or mini-

---

**116.** The Conference Report declares:

> Section 18 establishes a process which will permit the Secretary of Interior to *weigh* energy potential, and other benefits against environmental and other risks in determining *how, when, and where* oil and gas should be made available from the various Outer Continental Shelf areas to meet national energy needs.

H.R.Rep.No.1474, *supra* n.22, at 1 (emphasis added).

**117.** Thus, information gathered in considering the factors specified in sections 18(a)(2)(A), (B), (D), (G), and (H) would inform the Secre-

tary to a large degree of the potential for environmental damage; the information gathered upon consideration of the factors in sections 18(a)(2)(B), (C), and (D) would be pertinent to the potential for oil and gas discovery; and the information gathered under section 18(a)(2)(F) would be probative of the potential for adverse impact on the coastal zone.

**118.** 43 U.S.C. § 1332(3).

**119.** H.R.Rep.No.590, *supra* n.8, at 106, U.S. Code Cong. & Admin.News 1978, p. 1513.

mize risk of damage to the human, marine, and coastal environments;

(4) provide States, and through States, local governments, which are Impacted by Outer Continental Shelf oil and gas exploration, development, and production with comprehensive assistance in order to anticipate and plan for such impact, and thereby to assure adequate protection of the human environment;

(5) assure that State, and through States, local governments, have timely access to information regarding activities on the Outer Continental Shelf, and opportunity to review and comment on decisions relating to such activities, in order to anticipate, ameliorate, and plan for the impacts of such activities;

(6) assure that States, and through States, local governments, which are directly affected by exploration, development and production of oil and natural gas are provided an opportunity to participate in policy and planning decisions relating to management of the resources of the Outer Continental Shelf;

(7) minimize or eliminate conflicts between the exploration, development, and production of oil and natural gas, and the recovery of other resources such as fish and shellfish;

(8) establish an oilspill liability fund to pay for the prompt removal of any oil spilled or discharged as a result of activities on the Outer Continental Shelf and for any damages to public or private interests caused by such spills or discharges;

(9) insure that the extent of oil and natural gas resources of the Outer Continental Shelf is assessed at the earliest practicable time; and

(10) establish a fishermen's contingency fund to pay for damages to commercial fishing vessels and gear due to Outer Continental Shelf activities.[120]

The first stated purpose of the Act, then, is to establish procedures to expedite exploration and development of the OCS. The remaining purposes primarily concern measures to eliminate or minimize the risks attendant to that exploration and development. Several of the purposes, in fact, candidly recognize that some degree of adverse impact is inevitable.[121]

 That the Act has an objective—the expeditious development of OCS resources—persuades us to reject petitioners' view that the three elements in section 18(a)(3) are "equally important" and that no factor is "inherently more important than another." [122] The environmental and coastal zone considerations are undoubtedly important, but the Act does not require they receive a weight equal to that of po-

---

**120.** 43 U.S.C. § 1802 (emphasis added).

**121.** The historical background of section 18(a)(3) reinforces that view. The first of the 1978 Amendments' predecessor bills was S.3221, passed by the Senate in 1974. See n.22 *supra*. As introduced, the bill had no provision comparable to section 18(a)(3), but a floor amendment provided that timing and location of leasing shall be selected "so that areas with the greatest potential for environmental damage and impact on the coastal zone area are leased last." 120 Cong.Rec. S31644–45, 31667 (Sept. 18, 1975). When the bill was reintroduced as S.521 in 1975, the insistence on reducing environmental damage and coastal zone impact was somewhat modified:

timing and location of leasing [shall be selected] so that areas with the greatest potential for environmental damage and impact on the coastal zone area are leased last, *to the maxi-*

*mum extent practicable, consistent with the Secretary's determination of national needs.* S.Rep.No.284, 94th Cong., 1st Sess. 85 (1975); 121 Cong.Rec. S25961, 25971–72 (July 30, 1975).

The evolution of section 18(a)(3) neared its final stage in 1976, when OCS legislation went to conference and the agreed upon bill adopted the House language, the substance of which is identical to that of section 18(a)(3) as enacted. See H.R.Rep.No.1632, 94th Cong., 2d Sess. 21 (1976) (Conference Report on S.521). This bill, like S.3221, never became law. See n.22 *supra*.

Finally, in 1978, the present section 18(a)(3) was enacted as part of the 1978 Amendments. Its "proper balance" language contrasts sharply with the previous versions in which Congress had mandated a particular balance to be struck.

**122.** Brief for Petitioners at 81.

tential oil and gas discovery. A balancing of factors is not the same as treating all factors equally. The obligation instead is to look at all factors and then balance the results. The Act does not mandate any particular balance, but vests the Secretary with discretion to weigh the elements so as to "best meet national energy needs." The weight of these elements may well shift with changes in technology, in environment, and in the nation's energy needs, meaning that the proper balance for 1980–85 may differ from the proper balance for some subsequent five-year period. It is also relevant, when assessing potential environmental and coastal zone harm, to consider the availability of regulatory measures to alleviate that harm.[123] This does not mean that consideration of environmental damage may be postponed or foregone. But the potential for environmental harm cannot be adequately considered and weighed without a like examination of the potential to mitigate such harm.

The Act recognized the difficult burden the Secretary must shoulder by stating that the selection of timing and location of leasing must strike the proper balance "to the maximum extent practicable." The Secretary must evaluate oil and gas potential, which can be quantified in monetary terms, in conjunction with environmental and social costs, which do not always lend themselves to direct measurement. Because of this, they must be considered in qualitative as well as quantitative terms.

Although the secretarial discretion we have described is broad, as a result of both the general wording of the statute and the nature of the task Secretary is asked to perform,[124] the Secretary's discretion is not unreviewable. The policies and purposes of the Act provide standards by which we may determine whether the Secretary's decision was arbitrary, irrational, or contrary to the requirements of the Act.[125] To do so, we consider "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."[126]

The Secretary here recognized, in the enclosure accompanying his Final Program, that both the selection of the areas to be leased (location) and the priority in the schedule given to leasing those areas (timing), must strike a proper balance between the three elements of section 18(a)(3). As to location, the Secretary determined that

[i]f the anticipated benefits outweigh the anticipated costs for an area, then the "proper balance between the potential for environmental damage, the potential for the discovery of oil and gas, and the potential for adverse impact on the coastal zone" ... is to schedule the area for leasing consideration. The costs as well as the benefits involved will, of course, be much better known at sale time, but the lesser availability of information at this point is not a basis for declining to proceed with planning activities in an area unless the best estimate which can be

---

123. Among the Secretary's powers and duties to mitigate environmental harm are: (1) the regulatory authority of 43 U.S.C. § 1344(a); (2) the power to suspend operations, *id.* § 1344(a)(1)(B); (3) the power to cancel leases, *id.* § 1344(a)(2)(A); (4) the power to disapprove exploration plans, *id.* § 1340; (5) the requirement to conduct studies of impacts on marine life, *id.* § 1346(b); (6) the duty to require use of the best and safest technology, *id.* § 1347(b); (7) the power to disapprove production and development plans, *id.* § 1351; (8) the duty to disapprove a production and development plan if it cannot be implemented without serious harm to marine life, *id.* § 1351(H)(1)(D).

124. *See Massachusetts v. Andrus,* 594 F.2d 872, 886 (1st Cir. 1979):

Greater use of modern analytical techniques for calculating the possible consequences ... [of] environmentally significant activities may be desirable, ... but within wide limits, the final decision as to how much analysis is necessary in view of the available data must be the agency's subject to judicial review only for obviously incorrect results or methodology.

125. *See* Part III, *supra.*

126. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971).

**1318**

made now is that the costs in that area outweigh the benefits.[127]

As to timing, the Secretary determined that [t]he timing of sales which best meets national energy needs is one which moves into the most valuable areas first, where value is calculated taking into account potential economic social and environmental costs of oil and gas activity as described above.[128]

■■■ We endorse this interpretation of section 18(a)(3). It is reasonable to conclude that within the section's "proper balance" there is some notion of "costs" and "benefits," recognizing that "costs" in this context must be a term of uncertain content to the extent it is meant to stand for environmental and social costs.

We also agree with the Secretary's view that an area should be included within the program for further consideration when its potential "benefits" exceed its potential "costs." This is the view the Secretary urged upon Congress in his objections to those provisions in the bills preceding the 1978 Amendments which would have required that environmentally sensitive areas be leased last.[129] These provisions were subsequently modified to the present language of section 18(a)(3), which is clearly consistent with the Secretary's view.

Petitioners' objection to this view is essentially that it allows even significant environmental costs and coastal zone impacts to be overriden. Yet this is precisely what the Act intends, *provided* that the potential oil and gas benefits exceed those potential costs. If the Secretary makes that determination for a particular area, and is not arbitrary or capricious in doing so, the Act contemplates that it may be placed on the schedule and that the leasing process proceed, subject to the Secretary's power to regulate OCS activities to protect the environment at subsequent stages in that process.[130] It is not obvious either in theory or in practice that the Secretary's interpretation of the Act will invariably weigh benefits more heavily than costs, with the result that every area of the OCS is placed on the leasing program.[131]

■■■ However reasonable we think the Secretary's interpretation of section 18(a)(3) is as a general matter, the record compels the conclusion that it was not completely implemented. First and foremost, of course, is the Secretary's failure to consider and factor in all aspects of section 18(a)(2). This omission precluded him from meeting the requirement of section 18(a)(3) to obtain a proper balance to the maximum extent practicable. That fact is evident in the

---

**127.** Proposed Final Schedule, *supra* n.90 at 2, App. at 1822.

**128.** *Id.*

**129.** In commenting on S.521, see n.121 *supra*, the Interior Department stated:

the requirement that the most environmentally safe areas should be leased first is too restrictive. Environmental hazards must be balanced by potential resource values. On an area-wide basis, leasing would be appropriate wherever the potential value of the energy resource is expected to exceed environmental costs. Leasing on particular tracts may be unacceptable for environmental reasons, but this would be determined on the basis of an [EIS] [on specific sales.] S.Rep.No.284, *supra* n.121, at 48; for an earlier expression of this Department of Interior view, see H.R.Rep.No.1084, 94th Cong., 2d Sess. 165 (1976) (on H.R.6218, see n.22 *supra* ).

**130.** See generally n.123 *supra*.

**131.** We note that the leasing program excludes the areas offshore of Washington and Oregon, apparently on the basis that the oil and gas potential component of the section 18(a)(3) balance was too slight, and that the Secretary deleted a large segment of Alaska's Bristol Bay because "potential costs appeared to exceed potential benefits at this time." Proposed Final Schedule, *supra* n.90 at 3, App. at 1823.

Petitioners' point would be well-taken if only *quantitative* benefits and costs were considered, for in that case some environmental and coastal zone considerations, articulable only in quantitative terms, would necessarily be slighted. But we understand the Secretary to be saying that he reads and considers "costs" broadly, to include (1) operator costs, (2) cost imposed on alternative uses of the sea and seabed, (3) costs experienced in light of the laws, goals, and policies of affected states, and (4) costs in the form of environmental damages. Proposed Final Schedule, *supra* n.90, at 1–2, App. at 1821–22.

Secretary's explanation of how he timed the areas for leasing, which we have quoted above.[132] In relying solely upon industry interest, resource potential, and administrative convenience, the Secretary did not fully comply with all the statutory standards.

A further difficulty with the Secretary's actual approach—as opposed to his general interpretation—is that no substantial evidence appears in the record to support his assertion that he performed an area-by-area "cost-benefit" analysis. The only comparison of "costs" and "benefits" made available to him is the SID, which the Secretary states is a reflection of an "area by area assessment." [133] But actually the SID compares twelve leasing program alternatives.[134] "Costs" and "benefits" are shown only in the aggregate, for each leasing schedule; there is no area-by-area breakdown. We therefore have no basis on which to test the Secretary's program for fidelity to his interpretation of the statute, which is that locating an area within the program was based on a comparison of "cost" and "benefit," and that timing of an area within the program was some function of its relative value, potential "costs" and "benefits" considered.[135]

Petitioners not only complain that the Secretary understated environmental costs in striking his section 18(a)(3) balance, but also argue that he overstated potential economic benefits. The only report of expected economic benefit appears in the SID. The SID assigned to each of the twelve leasing program alternatives a "net economic value." The values ranged from $112 billion to $0 (for the alternative of no future OCS leasing).[136] Petitioners' problem with the SID's economic analysis is fourfold: (1) the speculative nature of the resource estimates is masked by use of a single figure rather than a range of figures;

(2) environmental costs are qualified only with respect to spill damage and cleanup costs; the economic losses that tourism, fishing, and other OCS-related activities would suffer in the event of an oil spill are ignored; (3) the $100 million figure used to represent oil spill damage is too low; (4) in treating delay in leasing as a factor reducing net economic value, the Secretary ignored the price rises in crude oil that make delay a factor increasing the value of any recovered resources. We address these points in turn.

First, we decline to require that the Secretary prepare a range of production estimates instead of a fixed number. The Department of Interior explained that the fixed numbers were calculated from estimates of the probabilities of oil and gas discoveries over a wide range of sizes.[137] We are presented with no cogent case that the reliance on fixed numbers was irrational.

Remaining unexplained, though, is the failure to evaluate the quantifiable impact of an oil spill upon fishing, tourism and other OCS-related enterprises. Estimates of damage to these activities, like estimates of potential oil and gas production, are necessarily speculative to a considerable degree. But, unlike some environmental costs, damage to tourism, fishing, and the like is not inherently insusceptible of quantitative analysis. No reason appears why such estimates cannot be made, and the Secretary offers no satisfactory excuse for the failure to make them.

The third complaint—that $100 million is too low an estimate for the damage and cleanup cost of a major oil spill (over 1,000 barrels)—we find to be without merit. The Department of Interior explained that $100 million was 142 percent of the estimated damage and cleanup costs of the mammoth

---

132. Pp. 1314–1315 *supra*.

133. Department of Interior brief at 82; *accord*, Letter from Assistant Secretary to Natural Resources Defense Council (Sept. 3, 1980) at 6, App. at 1943.

134. SID at 36–92; App. at 1556–1612.

135. See p. 1318.

136. SID at 36–92, App. at 1556–1612.

137. Letter from Assistant Secretary to Natural Resources Defense Council (Sept. 3, 1980) at 7, App. at 1944.

Santa Barbara spill, and few if any of the major spills predicted during the life of the leasing program can be expected to be of that magnitude—over 100,000 barrels.[138] Although we might pick another number to represent the damage and cleanup cost of a predicted oil spill, we cannot say the selection of $100 million was a clear error of judgment.

Finally, we are left uncertain as to whether the Secretary properly considered the economic effect of delaying lease sales. The Department explained that "[f]or alternatives involving the delay of specific sales, a discount factor was used to reduce the economic value of that sale to reflect the effect of the delay . . . ."[139] The effect of this reduction, of course, was to favor speedier leasing. The rationale for this reduction was explained in the May 1979 Draft Program in materials prepared by the Department of Interior.[140] The materials described the economic benefits of OCS oil production in terms of the difference between (1) the oil price charged by the Organization of Petroleum Exporting Countries (OPEC) and (2) the cost of finding and producing that oil from the OCS.[141] The materials then explained that, holding other factors constant, it is better to realize income as soon as possible, meaning that delaying the acquisition of an asset reduces its present value: "If resources 'earn' about 10% in our economy, the social value of a resource development can be increased 1.61 times if benefits can be made to occur 5 years earlier. A delay of 5 years reduces the value of the benefit by 38%."[142] The materials also recognized, however, that postponement of the realization of an asset makes sense if the asset increases in value faster than the figure (here, 10%) chosen to represent investment opportunities and the economic preference for immediate realization: "it is worth postponing the production of oil and gas for 5 years if the benefits after this wait would be at least 1.61 times the benefits of producing now."[143] The materials also considered varying rates of inflation, which would affect both the costs of extracting OCS oil and the price of OPEC oil. The materials estimated, for example, that at a 6% rate of inflation, a delay from 1979 to 1984 of extracting oil available in 1979 would require a 1984 price of $29.61 a barrel to be worthwhile (the 1979 price was $18.10 a barrel).[144] The materials also considered the annual rate of real price increases (the actual rate adjusted for inflation) for OPEC oil.[145] The report estimated that "the cost of 5 years of postponed production at $6 per barrel costs and 2% real growth in OPEC prices is $3.26 a barrel."[146] It concluded:

> it is worthwhile finding and producing any OCS oil and gas that is less costly than OPEC oil as soon as possible unless extraordinary increases in future world oil prices are expected. Otherwise "banking" oil in the ground will deprive the American people of present consumption and investment without sufficient future gains to offset the income they would forego.[147]

■ The record thus reflects a model for attributing a cost to delay. We are reluctant to interfere with an agency's choice of methodology so long as it is not irrational.[148] Certain aspects of the Department's computation of net economic worth are nevertheless troubling, and bear further explanation. First, it is unclear whether 2% as a rate of real increase for OPEC

---

138. *Id.* at 8, App. at 1945.

139. *Id.* at 6, App. at 1943.

140. "The 5-Year OCS Leasing Program: Some Economic Considerations," App. at 628–37.

141. *Id.* at 2, App. at 629.

142. *Id.* at 5, App. at 632.

143. *Id.*

144. *Id.*

145. *Id.* at 6, 7, App. at 633, 634.

146. *Id.* at 7, App. at 634.

147. *Id.* at 7, App. at 633.

148. *See, e.g., San Antonio v. United States*, 631 F.2d 831, 837 (D.C.Cir. 1980).

prices was chosen merely for purposes of illustration or as an assumption upon which the agency's computation was based. If the 2% figure was relied upon, then the basis for choosing that figure, when the experience of the period since 1973 suggests a far higher figure, is not revealed. Higher estimates of future OPEC prices would increase the estimate of the benefit of exploiting OCS benefits in the near future, as the Department has suggested, but it also appears to make further delay in exploitation more worthwhile, as petitioners argue.[149] Second, petitioners contend that there is an inconsistency in approach between the May 1979 program the Department cites in its brief to this court and the DOE study the Department pointed to in its September 1980 letter to NRDC.[150] Under the May 1979 program, net economic value is basically the difference between the OPEC price and the cost of OCS production. Under the DOE study, say petitioners, net economic value is determined by calculating industry profits from OCS production and expected federal tax revenues and royalty payments.[151] The interrelationship, if any, between the two studies, and the degree to which they informed the economic analysis affecting the Secretary's decision is not plain on the record before us. On remand, the Secretary should present a coherent explanation of how net economic value is being determined.[152]

### D. Did the Secretary Comply with the Requirements of Sections 18(c)–(d)?

■ As described in detail above,[153] sections 18(c) and 18(d) provide a procedural framework for participation by state governments, among others, in the development of the five-year leasing program. In essence, these sections require the Secretary to consider comments on, and requests for modification of, the proposed program made by Governors of affected states and to state his reasons for accepting or rejecting such recommendations. Petitioners contend that the Secretary's responses to their recommendations were inadequate, because the responses either failed to address the suggestions made or failed to provide "valid" reasons for rejecting them.

■ We disagree. Although it is true that many of the Secretary's responses were not overly detailed, they sufficed to identify the basis, either legal or factual, for the Secretary's action and to explain why the Secretary acted as he did. Fur-

---

**149.** *Compare* letter from Assistant Secretary to NRDC, *supra* n.137, at 6, App. at 1943 ("Benefits would be higher if estimated today because the continued increase in the world price of oil leads to expectations of higher future prices than were used by DOE") *with* Brief of Petitioners at 90 ("[T]he price of crude oil is rising at rates that exceed discount rates. Thus, delaying the development of OCS hydrocarbons tends to increase the value of any recovered resource.")

**150.** Letter from Assistant Secretary, *supra* n.137, at 6, App. at 1943.

**151.** Petitioners' reply brief at 35.

**152.** In defending his compliance with the requirements of sections 18(a)(2) and 18(a)(3), the Secretary heavily relies upon the failure of the staff of the House Select Committee on the Outer Continental Shelf to criticize the Secretary's interpretation of the statute. In *Energy Act Education Foundation v. Andrus, supra* n.21, at 750 n.74 stated:
 In general, "[T]he views of a subsequent Congress form a hazardous basis for infer-

ring the intent of an earlier one." *CPSC v. GTE Sylvania, Inc.*, 447 U.S. 102, 100 S.Ct. 2051, 2060–61, 64 L.Ed.2d 766 (1980) (quoting, *United States v. Price*, 361 U.S. 304, 313 [80 S.Ct. 326, 331, 4 L.Ed.2d 334] (1969)). There is, however, reason to give somewhat greater weight than usual to the views of a post-enactment oversight committee charged with responsibility for supervising the administration of the Act.
We have given deference to the views of the Committee staff. We nevertheless find its lack of objection insufficient, in and of itself, to justify overlooking the Secretary's deviation from the mandates of the Act. First, the staff report was not adopted by the House Select Committee. Second, the staff report did not attempt to confront the arguments raised by petitioners; it merely raised no objection to the Secretary's interpretation. Finally, as we have noted, in Part III *supra*, the task of interpreting statutes is a matter ultimately entrusted to the courts.

**153.** Pp. 1298–1299.

thermore, it is noteworthy that the recommendations the Secretary rejected relate primarily to substantive matters which this opinion has already addressed, and that petitioners found the Secretary's responses sufficiently coherent to explain them to this court and to argue that they were erroneous. In other words, petitioners seem to understand, from the Secretary's responses, why their suggestions were rejected. Sections 18(c) and (d) require no more.[154]

 We pause briefly to address the argument that sections 18(c) and (d) require the reasons advanced by the Secretary to be "valid" in some substantive sense. We find no basis for such a requirement in the statutory language. Section 18(c) directs the Secretary to respond to any state request for modification of the proposed program, granting or denying the request in whole or

in part as he deems appropriate, "and stating his reasons therefor." [155] Section 18(d) requires the Secretary to submit the proposed program to Congress and the President prior to approving it, indicating "why any specific recommendation of . . . a State . . . government was not accepted." [156] These provisions merely require the Secretary to state his reasons for accepting or rejecting state recommendations. It is true, of course, that a substantively "invalid" response may demonstrate that the Secretary has not prepared the leasing program in compliance with the substantive requirements of section 18 or other pertinent provisions of the Act. Such matters, however, should be addressed and evaluated under the substantive portions of the statute, and not under sections 18(c) and (d).[157]

---

154. Petitioners also argue that the section 4(c) of the Administrative Procedure Act, 5 U.S.C. § 553(c) and "well established principles of administrative law" impose an independent and more stringent burden upon the Secretary to articulate his reasons for rejecting state recommendations, his interpretation of section 18, and his reasons for selecting the leasing schedule he chose. We disagree. First, the Outer Continental Shelf Lands Act itself contains provisions requiring the Secretary to respond to state comments and to explain and articulate his decision. *See* 43 U.S.C. §§ 1344(c), (d), 1349(c). We see no need to engraft other provisions onto those found in this comprehensive statute. *Cf. Vermont Yankee Nuc. Power Co. v. NRDC,* 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). Second, the APA itself exempts from its reach "matters relating to agency management or personnel or to *public property,* loans, grants, benefits, or contracts." 5 U.S.C. § 553(a)(2) (emphasis added). Since the leasing program relates to agency management of the OCS, which is undoubtedly public property, *see* 43 U.S.C. § 1332, the APA itself would appear to take the leasing program outside its scope. *See* Attorney General's Manual on the Administrative Procedure Act at 27 (1974); *Duke City Lumber Co. v. Butz,* 382 F.Supp. 362, 372–73 (D.D.C.1974), *aff'd,* 539 F.2d 220 (D.C.Cir.1975).

155. 43 U.S.C. § 1344(c)(1).

156. 43 U.S.C. § 1344(d)(2).

157. Petitioners also argue that the Secretary's response to their recommendations was inadequate because the Secretary failed to comply with the requirements of section 19, 43 U.S.C. § 1345. Section 19 provides:

(a) Any Governor of any affected State or the executive of any affected local government in such State may submit recommendations to the Secretary regarding the size, timing, or location of a proposed lease sale or with respect to a proposed development and production plan. Prior to submitting recommendations to the Secretary, the executive of any affected local government in any affected State must forward his recommendations to the Governor of such State.

(b) Such recommendations shall be submitted within sixty days after notice of such proposed lease sale or after receipt of such development and production plan.

(c) The Secretary shall accept recommendations of the Governor and may accept recommendations of the executive of any affected local government if he determines, after having provided the opportunity for consultation, that they provide for a reasonable balance between the national interest and the well-being of the citizens of the affected State. For purposes of this subsection, a determination of the national interest shall be based on the desirability of obtaining oil and gas supplies in a balanced manner and on the findings, purposes, and policies of this subchapter. The Secretary shall communicate to the Governor, in writing, the reasons for his determination to accept or reject such Governor's recommendations, or to implement any alternative means identified in consultation with the Governor to provide for a reasonable balance between the national interest and the well-being of the citizens of the affected State.

(d) The Secretary's determination that recommendations provide, or do not provide, for

## V. THE FEDERAL TRUST RESPONSIBILITY CLAIM

Petitioners North Slope Borough, et al. (the Borough), representing the interests of Inupiat Eskimos who live throughout the borough, contend that the Secretary, in preparing the leasing program, breached a trust responsibility owed the Eskimos. The claim is twofold: (1) the Secretary failed to accord special protection to Eskimo interests, and (2) he proceeded on the basis of environmental data inadequate to assure that Inupiat culture would not be undermined by his oil and gas decisions. The Eskimos' concern is that OCS operations in the Beaufort or Chukchi seas will have an adverse effect on the area's whales, caribou, seals, polar bears, fish, and birds.[158] Any such effect could undermine the subsistence lifestyle of the Eskimos, who rely on these animals for their food, clothing, and materials,[159] and whose "village-wide whaling activity [is] a foundation of their socio-cultural system." [160]

The Secretary was cognizant of these concerns in the preparation of the leasing program, but thought they required no more attention than that already required under environmental statutes:

> The Marine Mammal Protection Act, the Endangered Species Act, and other stat-

a reasonable balance between the national interest and the well-being of the citizens of the affected State shall be final and shall not, alone, be a basis for invalidation of a proposed lease sale or a proposed development and production plan in any suit or judicial review pursuant to section 1349 of this title, unless found to be arbitrary or capricious. The Secretary refused to consider state recommendations under section 19 during the development of the leasing program on the grounds that section 19 did not apply at the program stage, but rather to individual proposed lease sales and proposed development and production plans. Letter from Secretary of Interior Andrus to Governor Hammond of Alaska, (July 1, 1980) at 2, App. at 1931; Letter from Assistant Secretary Meierotto to Natural Resources Defense Council (Sept. 3, 1980) at 5, App. at 1942. Petitioners contend that section 19 applies to development of the leasing program, and requires the Secretary to accept state recommendations unless he determines they do not provide for "a reasonable balance between the national interest and the well-being of the citizens of the affected State." 43 U.S.C. § 1345(c), (d).

We agree with the Secretary that section 19 does not apply to development of the leasing program under section 18. First, given that Congress specified precise procedures for the treatment of state comments in section 18 itself, it would create an anomaly to conclude that Congress also intended the different procedures contained in a separate section of the statute to apply as well, especially when the two sections contain different standards. Section 18, for example, directs the Secretary to grant or deny, in whole or in part, requests for modifications of the program as he "considers appropriate." 43 U.S.C. § 1344(c)(2). Section 19, on the other hand, directs the Secretary to accept state recommendations "if he determines ... that they provide for a reasonable balance between the national interest and the well-being of the citizens of the affected State." 43 U.S.C. § 1345(c).

In any event, the specific language of section 19 itself makes clear that Congress spoke to individual lease sale decisions and not to the leasing program when it authorized Governors of affected states to submit under section 19 recommendations regarding "the size, timing, or location of a proposed lease sale," 43 U.S.C. § 1345(a). See *California v. Watt*, 520 F.Supp. 1359, at 1383–1385 (C.D.Cal.1981). Section 19(b) provides that such recommendations "shall be submitted within sixty days *after notice of such proposed lease sale*", 43 U.S.C. § 1345(b) (emphasis added), and the notice of a proposed lease sale appears on the leasing schedule as an event occurring in the later stages of OCS planning, approximately 4–5 months prior to the sale date. Since the notice of a proposed lease sale occurs after the leasing program has been prepared, as Congress was aware, see H.R. Rep. No. 590, *supra* n.8, at 63, and as are petitioners, Brief for Petitioners at 108, section 19 obviously cannot apply to development of a leasing program under section 18.

We recognize that the legislative history contains some language which could be understood to express an intent that section 19 applies to development of a leasing program. *E.g.*, H.R. Rep. No. 590, *supra* n.8 at 107. These two sentences, however, taken as they are from a general descriptive portion of the House Report which merges its discussion both section 18 and 19, are insufficient to overcome the vastly stronger manifestations of Congressional intent pointing in the opposite direction.

**158.** The leasing program schedules a sale in the Beaufort Sea in 1983 and in the Chukchi Sea in 1985. *See* n.53 *supra*.

**159.** FES 143.

**160.** *Id.* at 297.

utes and treaties are designed primarily to protect certain species of fish and wildlife. * * * These statutes, amongst others, have been construed as specifically imposing on the Federal Government a trust responsibility to protect Native Alaskans right to subsistence hunting. The responsibility requires the Secretary to be cognizant of the needs of Native Alaskans' culture, and to protect the species necessary for subsistence purposes. The Secretary can discharge his trust responsibility primarily by complying with the two above-cited Acts. Decisions regarding compliance for particular species will occur as individual lease sale decisions are made.[161]

■ The Borough contends that the Secretary interpreted his trust responsibility too narrowly. According to the Borough, the source of the trust responsibility is independent of any statute, treaty, or executive order, and its scope is "necessarily" "broader than specific enactments."[162] From this premise it concludes that the Secretary, concerned only with fulfilling his statutory responsibilities, gave insufficient weight to the Eskimos' special interests. We reject this conclusion, for we find that its premise—the existence of a trust responsibility broader in scope than the duties imposed by environmental statutes—was rejected in our recent decision in *North Slope Borough v. Andrus.*[163]

In *North Slope Borough* the same claims that the Borough makes here in the context of a leasing program were made in the context of an offshore lease sale in the Beaufort Sea. There, as here, the Borough identified three possible sources of a trust responsibility owed by the federal government to the Inupiat Eskimos. One was express statutory provision, another was a combination of the express and implied requirements of specific enactments, and the

third was some combination of the law of nations, concepts of Indian sovereignty, and the historical course of dealing between Indians and the federal government.[164] The panel explicitly addressed only the first of these sources, finding "no specific provision for a federal trust responsibility in any of the statutes argued to us."[165] It reached its conclusion "that the Secretary has fulfilled his trust obligation, such as it is,"[166] without determining whether any trust responsibility emanated from "other statutes ... or ... a 'special relationship' between the United States and Indian tribes."[167]

The Borough interprets this failure to address other possible sources of a trust responsibility as a failure to resolve the question whether the Secretary owed the Inupiat Eskimos a trust responsibility broader in scope than the responsibilities imposed by relevant environmental protection statutes, and invites us to resolve that question in its favor here. We decline that invitation, for both the structure and language of *North Slope Borough* indicate that while that decision left the source of the Secretary's trust responsibility undefined, it delineated the *scope* of that responsibility as being no broader than that of the environmental statutes with respect to which the Secretary already had a duty to comply.

First, and most fundamental, *North Slope Borough's* ultimate holding on the trust responsibility issue was that the "Secretary has fulfilled his trust obligation, such as it is."[168] In arriving at that holding, which was grounded on the Secretary's compliance with pertinent environmental statutes, the panel necessarily rejected the Borough's contention that the Secretary had a trust obligation broader in scope than the requirements of relevant environmental statutes.

**161.** SID at 33, App. at 1553.

**162.** Brief for the Borough at 33.

**163.** 642 F.2d 589, 593, 611–13 (D.C.Cir.1980).

**164.** See Reply Brief for the Borough at 3–4.

**165.** 642 F.2d at 612.

**166.** *Id.*

**167.** 642 F.2d at 611 n.148.

**168.** *Id.* at 612.

The Borough recognizes the obvious force of this logic, but submits that *North Slope Borough* could not have rejected its argument for a trust responsibility of broader scope because it did not address the possible extra-statutory sources for such a responsibility. We disagree. The panel approved, in effect, the approach of "confining the extension of 'trust responsibility,' *however defined and whatever the source*, to the area of overlap with the environmental statutes." [169] Thus, regardless of the *source* of the trust responsibility—in this context an academic question only—the panel was satisfied that its *scope* "is a limited one *only*." [170] The court explained those limits in some detail:

> [T]he primary threat to the Inupiats can only be viewed as one of a possibly deleterious intrusion into their lands. But the Secretary, even aside from his imputed role of trustee, does not have a free hand to neglect the environment. All of the environmental statutes, particularly [the Endangered Species Act], structure and prescribe for the Secretary a solicitous stance toward the environment. Hence, where the Secretary has acted responsibly in respect of the environment, he has implemented responsibly, and protected, the parallel concerns of the Native Alaskans. In sum, the substantive interests of the Natives and of their native environment are congruent. The protection given by the Secretary to one, as we have held, merges with the protection he owes to the other.[171]

We thus conclude that the dispositive issue here—the scope of the Secretary's trust responsibility to the Inupiat Eskimo—was addressed and decided adversely to the present contentions of the Borough in *North Slope Borough v. Andrus*. To the extent that the Secretary complied with relevant environmental statutes in preparing the leasing program, he also fulfilled any trust responsibility owed to the Eskimos.

## VI. SUMMARY

The 1978 Amendments to the Outer Continental Shelf Lands Act require the Secretary of Interior to prepare a five-year national leasing program in accordance with an "uneasy calculus" [172] of potentially competing economic, environmental, and coastal state concerns. Section 18 of the Act seeks to assure that the size, timing, and location of proposed lease sales within the program are selected so as to achieve a proper balance, to the maximum extent practicable, among these disparate concerns. While much of the Secretary's program is free from infirmity, he erred in failing (1) to identify Sales 73 and 80 with greater specificity, (2) to consider the need to share developmental benefits and environmental risks among the various OCS regions, (3) to consider the relative environmental sensitivity and marine productivity of different areas of the OCS, (4) to base timing and location of leasing on some of the standards of section 18(a)(2), (5) to strike a proper balance incorporating environmental and coastal zone factors and not simply administrative need and economic factors such as potential oil and gas recovery, (6) to quantify environmental costs to the extent they are quantifiable, and (7) to adequately explain his determination of net economic value, particularly the economic effects of delaying leasing. We find section 19 of the Act, and the Administrative Procedure Act, to be inapplicable to preparation of a leasing program under section 18. We find no violation of any trust responsibility owed to Inupiat Eskimos, and we find it unnecessary to reach petitioners' claims under the National Environmental Policy Act.

## VII. RELIEF

Section 23(c)(6) of the Outer Continental Shelf Lands Act provides:

> The court of appeals conducting a proceeding pursuant to this subsection . . .

**169.** *Id.* at 612 (emphasis added).

**170.** *Id.* at 612.

**171.** *Id.*

**172.** *Massachusetts v. Andrus*, 594 F.2d 872, 892 (1st Cir. 1979).

may affirm, vacate, or modify any order or decision or may remand the proceedings to the Secretary for such further action as it may direct.[173]

Petitioners do not request that we vacate the leasing program. Rather, they ask that we simply remand the program to the Secretary for reconsideration in accordance with the Act, and with opportunity for public comment, and approval by the new Secretary of Interior.[174] Following oral argument, petitioners informed us that the new Secretary is presently in the process of preparing a revised five-year program covering the years 1982–86. Petitioners state that this provides a convenient opportunity to

grant the requested relief without unnecessarily disrupting the leasing process.[175]

▮▮▮ Pursuant to the broad equity powers vested in us pursuant to section 23(c)(6), we grant the relief requested. Although we do not vacate the program, thereby allowing the proposed lease sales scheduled thereon to proceed, we remand the program under review and the record thereof to the Secretary for revision in accordance with the Act. We retain jurisdiction over this case until the Secretary has revised and reapproved the program presently under review.[176]

*Judgment accordingly.*

---

**173.** 43 U.S.C. § 1349(c)(6).

**174.** Brief for Petitioners at 133.

**175.** Motion to Apprise the Court of Recent Developments at 2 (April 24, 1981).

**176.** Petitioners also request that we enjoin the Secretary from conducting Lease Sale 53 until he has revised and reapproved the program presently under review. Petitioners state that although several areas in the program are of concern to them because they are particularly sensitive and because their resources, other than oil and gas, are particularly valuable, only Lease Sale 53 of these areas is presently scheduled to take place during the remand period. Brief for Petitioners at 134–135. The Secretary and intervenors argue, on the other hand, that an injunction may not be granted as to any specific sale on the program absent a showing that the Secretary acted unlawfully in determining the timing or location of that particular sale. They also argue that section 18(d)(3), 43 U.S.C. § 1344(d)(3), may preclude altogether the issuance of any injunctive relief. We agree. That section provides: "leasing shall be permitted to continue until [the leasing] program is approved and for so long thereafter as such program is under judicial or administrative review pursuant to the provisions of this subchapter." In our view, the plain meaning of this language is that leasing shall continue both during judicial review of the leasing schedule and during any administrative review occasioned by a remand from a reviewing court. This view is consistent with the legislative history:

> There is intended to be no delay or interruptions in lease sales. During the period of time that the proposed leasing program is being considered and determined, leasing is to continue as heretofore. Once the leasing program is approved, leasing is to continue under that program. If the approved leasing

program is under judicial challenge, leasing can continue until judicial review is completed.

H.R. Rep. No. 590, *supra* n.8, at 151, S. Rep. No. 284, *supra* n.9 at 76–77 (emphasis added), U.S.Code Cong. & Admin.News 1978, p. 1557. Although the legislative history does not speak directly to the period following remand, it could not be more clear in expressing a desire for speed in the lease sale process. Moreover, we understand § 18(d)(3)'s phrase "administrative review" to encompass the remand as well as the pre-approval period of administrative decision-making.

During development of the leasing program, petitioners' concern over Lease Sale 53 centered on their desire to have the Secretary delete the three middle basins (Point Arena, Bodega, and Santa Cruz) from this proposed Central and Northern California lease sale. Brief for Petitioners at 32, n.42. On October 16, 1980, however, subsequent to adoption of the program, the Secretary deleted these basins, as well as the Eel River Basin, from Lease Sale 53. *Id.* Petitioners' concern now is that the Secretary retains the option of offering these basins for leasing in either 1983 or 1984 under the sales designated as simply "California". *Id.* The Secretary points out, however, that this possibility is remote on the present record since the call for nominations for the 1983 sale (Sale 73) deleted these same basins. *See* 43 Fed.Reg. 79401 (November 28, 1980).

Under these circumstances, there appears to be no present need to enjoin Sale 53, even assuming we have the authority to do so. The basins of concern to petitioners are not presently scheduled for leasing, and our opinion in this case requires the Secretary to specify the location of Sales 73 and 80 with greater specificity. *See* Part IV(a), *supra.* Furthermore, given that these sales are not scheduled until 1983 and 1984, the leasing program may be finally approved before these basins reappear on the program, if they ever do.